NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0430n.06

Nos. 18-2268, 18-2269, 18-2323, 18-2324, 18-2342, 18-2364,
18-2365, 18-2401, 18-2407,18-2408, 18-2410, 19-1028, 19-1029

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,  )
　)
　　Plaintiff-Appellee,  )
　)
　　　　v.  )
　)
MICHAEL KENNETH RICH (18-2268/2269);  )
CARY DALE VANDIVER (18-2323/2324);  )
PATRICK MICHAEL MCKEOUN (18-2342); JEFF  )
GARVIN SMITH (18-2364/2365); DAVID RANDY  )
DROZDOWSKI (18-2401); PAUL ANTHONY  )
DARRAH (18-2407/2408); VINCENT JOHN  )
WITORT (18-2410); VICTOR CARLOS  )
CASTANO (19-1028/1029),  )
　)
　　Defendants-Appellants.  )
　)

**FILED**
Sep 13, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: SUHRHEINRICH, GRIFFIN, and DONALD, Circuit Judges.

GRIFFIN, Circuit Judge.

Today's published opinion addresses two issues of first impression for our court. This unpublished appendix to that opinion contains our decision on the remaining issues raised by defendants on appeal.

I.

Formed in the late 1960s, the "Devils Diciples [sic] Motorcycle Club" (DDMC) was a national motorcycle club that primarily operated out of southeast Michigan, with chapters across the country. It had a top-down organizational structure, complete with national and local bylaws.

Defendant Jeff Smith oversaw the Club as its national president. Defendants Paul Darrah and Cary Vandiver also held national roles as vice-president and "warlord," respectively. (Each chapter had similar leadership roles for local-level control.) Members first had to go through a "prospecting" process before fully joining the Club as a "patched" member. Chapters met on a regular basis and the Club gathered periodically as a whole.

At its core, the DDMC was an organization that centered on methamphetamine (but engaged in other criminal activities like stealing motorcycles and maintaining illegal gambling machines). Its members and those associated with the Club used methamphetamine, which was readily available at its clubhouses and social events. They also manufactured and distributed large-scale quantities of it. Defendant Vincent Witort, a long-time California member with a national reputation, frequently supplied other club members with distribution levels of the drug manufactured across the country (including from an underground "lab" in Alabama). Those members who trafficked drugs were required to "kick up" a portion of their sales to national leaders. Smith, Darrah, Vandiver and defendant Patrick McKeoun (a respected club elder) all helped oversee and facilitate the drug's movement in and outside of the Club. McKeoun, for example, convinced Smith and Vandiver to let a large-scale dealer distribute his methamphetamine because he agreed to supply it to DDMC members and to help them financially when needed. And Darrah collected dealers' "taxes" and otherwise coordinated the flow of drugs throughout the Club's network. Defendant David Drozdowski was a prolific methamphetamine cook and an ambitious up-and-coming member of the Club. Defendant Victor Castano was a large-scale marijuana dealer before he joined the DDMC, and he added methamphetamine trafficking to his repertoire when he became a fully patched DDMC member. And defendant Michael Rich, like McKeoun, was an elder statesman of the Club who encouraged the drug's use and distribution—

in one poignant instance at a local clubhouse, Rich "gave permission" to those who wanted to sample from a "gallon-size bag" of meth before it was divided and sold.

The DDMC enforced its ways through hierarchy, discipline, and violence. Failure to abide by club rules could lead to fines, "black eyes" (being punched in the eye by order of club leadership), and ultimately expulsion from the Club (and when that happened, the DDMC would steal the former member's motorcycle and take his paraphernalia, like the patched vest). But there were more violent forms of discipline. There were at least three murders, and several assaults against members and their associates. Innocent bystanders were not safe either, with one instance of assault against someone who just happened to be wearing a vest that looked like a rival club's vest. And the Club strictly enforced its "talk s--t, get hit" motto; it made clear that "snitching" to law enforcement officials was not to be tolerated through its use of ostracization, threats, and violence. In at least one instance, club leadership coordinated perjurious testimony to help a member try to defeat a firearm charge.

The original indictment in these cases was rendered in 2011. Following a separate indictment and several superseding ones, the district court ultimately had before it over forty defendants charged with myriad crimes. Most pleaded guilty, but those who did not were tried in two groups. Those who pleaded guilty provided substantial testimony at both trials.

In 2015, defendants were all convicted of Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy (Count 1), and with the exception of Rich (who was not charged), all were also convicted of conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances (Count 3). Other convictions included an illegal gambling conspiracy, witness tampering, obstruction of justice, subornation of perjury, and several violent crimes in aid of racketeering (also known as VICAR). The combination of the RICO conspiracy and drug-

trafficking conspiracy convictions became significant at sentencing because it lifted RICO's 20-year statutory-maximum ceiling to life in prison. The district court conducted significant fact-finding during sentencing, and generally concluded that each defendant was accountable for "relevant conduct" that occurred while he was a "patched" club member. This ultimately resulted in life sentences for Smith, Darrah, Vandiver and Witort, and sentences in excess of thirty years for the other four defendants.

These consolidated appeals are another prime example of the adage that "[l]osers in a trial can go hunting for relief on appeal with a rifle or a shotgun. The rifle is better." *Fathera v. Smyrna Police Dep't*, 646 F. App'x 395, 400 (6th Cir. 2016) (citation omitted). The eight defendants here have each elected a shotgun for their own appeals, cumulatively raising over seventy issues that span from pretrial rulings through sentencing. And through adoption of others' briefs, each wish to take credit for their co-defendants' similar strategy of scattered rounds over targeted shots.

II.

There are three pretrial issues: (1) the legality of several Title III wiretap orders; (2) the government's alleged breach of Castano's proffer agreement and its supposed vindictive prosecution of him; and (3) a purported Sixth Amendment violation regarding Witort's hiring of new counsel just before trial.

A.

We begin with the wiretap of the DDMC's Vice-President, Paul Darrah. Congress granted statutory authority for law enforcement interception of private telephone conversations when it passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–23. The statute permits a federal judge to issue a wiretap order if the government establishes: (1) probable cause to believe that the targeted individual engaged or will engage in certain criminal

activity; (2) that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"; and (3) the wiretap application includes "a full and complete statement" in that regard. § 2518(3)(c), (1)(c). Darrah argues that the affidavits in support of wiretap applications for his phone did not establish probable cause or necessity for the wiretap. We disagree.

1.

When reviewing Title III intercept orders for probable cause, we use the same standard used to evaluate search warrants. *See United States v. Alfano*, 838 F.2d 158, 161–62 (6th Cir. 1988). "Certainty is not required, but rather a fair probability and something more than mere suspicion." *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011). We evaluate the affidavit "on the totality of the circumstances and in a reasonable and common sense manner," and give "great deference" to the issuing judge's determination that probable cause existed to issue the intercept order because he was "in the best position to determine all of the circumstances in the light in which they may appear at the time." *Alfano*, 838 F.2d at 161–62 (citation omitted). Finally, because the district court denied Darrah's motions to suppress the fruits of the Title III surveillance, "we review all evidence in the light most favorable to the government." *United States v. Young*, 847 F.3d 328, 342 (6th Cir. 2017).

The affidavit provided by Special Agent Fleming more-than-adequately established probable cause to believe that a wiretap of Darrah's phone would lead to evidence of the DDMC drug-trafficking organization. It was replete with information establishing Darrah's position as Vice President of the DDMC and his role as a "buffer" between other members of the Club and its President, Jeff Smith. The affidavit further detailed concrete examples of Darrah's personal involvement in the DDMC's criminal activities. For example, Special Agent Fleming explained

how Darrah facilitated a controlled buy made by a cooperating witness (later identified as John Pizzuti) from Vern Rich on September 6, 2007. On that date, Darrah and Rich exchanged several telephone calls in the morning, and Darrah called Pizzuti to explain that Rich had dropped something at Darrah's house. Darrah then brought the item—methamphetamine—to Pizzuti in exchange for money. From this incident (and many others), the issuing judge correctly determined that the affidavit set forth a probability or substantial chance that tapping Darrah's phone would lead to evidence relating to criminal activity.

Arguing to the contrary, Darrah does not take the evidence in the light most favorable to the government nor address the totality of the circumstances. For example, he downplays his role in the drug transaction discussed above, suggesting that the affidavit establishes only "that Darrah made a phone call as to an item left at his home by a DDMC member." But the affidavit contains much more detail, outlining precisely how Darrah facilitated the sale of methamphetamine from Vern Rich to the cooperating witness. Along the same line, Darrah takes the position that he would never discuss criminal activity on the phone, so the affidavit could not establish a reasonable probability that a wiretap of it would lead to evidence of criminal activity. He is wrong. Even if Darrah used coded language and veiled references in every call, it could still lead to evidence of criminal activity because law enforcement officers were able to use cooperating witnesses, confidential informants and other investigative techniques to break Darrah's "code" and implicate him in the Club's criminal activity. Accordingly, we reject Darrah's arguments that the affidavit failed to establish probable cause for issuance of the original Title III intercept order.

2.

Regarding necessity, federal law enforcement officials must make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This "[e]nsure[s] that wiretapping is not resorted to in a situation where traditional investigative techniques would suffice to expose the crime." *Young*, 847 F.3d at 343 (citation omitted). "What is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation." *Id*. (brackets and citation omitted). In other words, the government "is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. We review a district court's factual finding of necessity for clear error. *See United States v. Cooper*, 893 F.3d 840, 844 (6th Cir. 2018).

Darrah asserts that the necessity standard was not met because the government was able to obtain "overwhelming information" from other sources. But we have held in numerous cases that some measure of success in obtaining evidence from other sources is not determinative of necessity. *See, e.g.*, *United States v. Corrado*, 227 F.3d 528, 539–40 (6th Cir. 2000) (rejecting argument that the government failed to demonstrate necessity where its "agents had already gathered an exceedingly large quantum of evidence"). The same is true here. As the district court observed, Fleming's affidavit made clear that "[t]raditional investigative means were considered and were correctly deemed insufficient to meet the Government's legitimate need of uncovering the extent of the alleged criminal enterprise, the potential participants, and determining how the enterprise functioned." That is exactly what Title III requires of officers seeking a wiretap. *See Alfano*, 838 F.2d at 163–64; *see also Poulson*, 655 F.3d at 504 (finding the necessity requirement satisfied where the government had "used a confidential informant, consensual recordings, a pen register, physical surveillance, and documents before resorting to the wiretap"). Accordingly, Darrah's necessity argument fails.

3.

Darrah separately challenges the legality of six extensions the FBI sought and received for the wiretap. When seeking an extension of an intercept order, Title III requires "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. § 2518(1)(f). Our review of the affidavits in support of each application for an extension of the Darrah intercept order establishes that the district court did not clearly err when it found this requirement was met. *Corrado* again provides a comparable set of facts. There, the court summarized the affidavits as follows:

> [T]he affidavits tendered by the government in support of its Title III applications typically run seventy to one hundred pages and include a detailed description of the evidence that had already been obtained as well as a separate section detailing the aims of and need for continued electronic surveillance. The justifications listed by the government included the facts that the organization under investigation was believed to be an organized crime family that was substantially insulated against infiltration, that additional victims/witnesses would be unlikely to speak to the government out of fear of reprisal, and that attempts to interview these witnesses might compromise the government's investigation.

227 F.3d at 539. Based on this, we concluded that the issuing judges did not abuse their discretion by granting the government's extension applications. *Id.* The same logic controls here. Each of the successive affidavits set forth probable cause to believe that a wiretap of Darrah's phone would lead to additional evidence of the DDMC's criminal enterprise and activities, recapped the investigative efforts, and explained why an extension of the wiretap was justified. We see no basis to reverse the district court on this ground.

4.

Darrah also takes issue with alleged misrepresentations in several of the affidavits, which he says falsely painted him as an "enforcer" of the DDMC, even though he suffers from numerous health issues, including a tracheotomy, a heart condition, diabetes, and a genetic blood disorder.

He requested a hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). To get a *Franks* hearing, Darrah had to make a "substantial preliminary showing" that the attesting agent had knowingly or recklessly made misstatements or omissions of material information and that they were "necessary to the finding of probable cause" of the issuing judge. *Id*. The district court heard argument and denied the motion:

> [Defendant argued] that [his] physical limitations were not adequately displayed or revealed to Judge Borman, and that it could have given him as the issuing judge a mistaken impression of physical vitality that Darrah did not have. I think . . . [the alleged misstatements are] insufficiently relevant to be of any importance in the issuance of a Title III intercept. In conclusion, there are no . . . omissions or misrepresentations identified. Such suggestions of misrepresentations or omissions are not material to the findings made by the issuing judge, so the motion for a *Franks* hearing is . . . denied.

We evaluate the "district court's denial of a *Franks* hearing under the same standard as for the denial of a motion to suppress: the district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo." *United States v. Bateman*, 945 F.3d 997, 1007 (6th Cir. 2019) (citation omitted). We agree with the district court that a *Franks* hearing was not necessary because the alleged misrepresentations were not material to the findings of probable cause made by the issuing judge. Whether or not Darrah had the physical capability to act as an "enforcer," the affidavits established a substantial basis to believe that Darrah, as the Vice-President of the DDMC, oversaw and coordinated the Club's criminal activity and that he was personally involved in trafficking both meth and prescription painkillers. As the district court found then, any reference to Darrah's physical prowess or propensity for violence was not material to the issuing judge's finding of probable cause.

Accordingly, we affirm the district court's denials of Darrah's motions to suppress.

B.

We next turn to Castano's arguments that the district court should have dismissed the indictment lodged against him because the government used statements obtained via a proffer agreement for which he was granted immunity, and/or because his Fifth Amendment right to due process was violated when the government engaged in a vindictive prosecution of him. We reject both claims.

1.

Castano first argues that the government violated *Kastigar v. United States*, 406 U.S. 441 (1972), by entering into a proffer agreement with him, and then using his immunized statements in grand jury proceedings and at trial.

Some context is necessary to understand this claim. In 2006, a jury convicted Castano of drug-distribution and firearm-possession charges. During the government's case-in-chief, DDMC members Vern Rich and Buck Lonsby gave testimony that contradicted Castano's retelling of the events leading up to his arrest. *See United States v. Castano*, 543 F.3d 826, 829–30 (6th Cir. 2008). While incarcerated, Castano met with an Assistant United States Attorney and incriminated certain members of the DDMC, namely Rich and Lonsby. After Castano's sentence was cut short by his successful appeal of the firearms conviction, the government requested that he submit to a proffer as part of its larger investigation into the DDMC. The proffer letter promised that "no statement made . . . during [the] proffer discussion [would] be offered against [Castano] in the government's case-in-chief in any criminal prosecution . . . for the matters currently under investigation." However, the government's grant of immunity was contingent upon Castano making "a complete and truthful statement of his knowledge of (and role in) the matters under investigation, and to fully and truthfully answer all questions." The letter specified that if Castano were to "omit facts

about crimes, other participants, or his . . . involvement in the offenses," he would be in material breach of the agreement. Further, it clarified that the proffer letter and interview were not plea discussions within the meaning of Federal Rule of Criminal Procedure 11 or Federal Rule of Evidence 410, so "[a]ny use of the statements and information" was governed only by the "terms of [the] letter." Finally, the last paragraph reiterated that if Castano "fail[ed] to provide truthful and complete information," then there were "no restrictions on the government's use of any statements made" during the proffer interview.

Castano agreed to the terms and met with the government for an interview. He admitted that he became a DDMC prospect in July of 2003 and earned his patch as a full member shortly thereafter. And he spoke about some of his marijuana dealings and the obstruction of justice and/or perjury related to his 2006 trial. Castano again implicated Vern Rich and Buck Lonsby, but he largely did not discuss other DDMC members.

About three weeks after Castano's proffer, the government used his testimony in the ongoing grand jury proceedings related to the DDMC investigation. Castano was subsequently indicted on multiple felony counts, including RICO conspiracy, drug conspiracy, and conspiracy to suborn perjury. During pretrial proceedings, Castano filed a spate of motions, including requests for the court to dismiss the indictment for vindictive prosecution and for an evidentiary hearing on his claim that the government violated his rights under *Kastigar*. The government filed a motion in limine affirmatively seeking to use Castano's statements against him in its case-in-chief because he had materially breached the terms of the proffer letter.

The district court held a hearing on the government's motion in limine during Castano's trial but did not address Castano's motions. At the hearing, "[t]he only issue" was whether Castano made "omissions significant enough" to have materially breached the proffer agreement. The

government argued that Castano had intentionally omitted material information about the DDMC's dealings. As just one example, the government highlighted that Castano omitted information that he had arranged for DDMC member Mike Mastromatteo to purchase 400 pounds of marijuana in a single transaction. The district court accepted the government's argument:

> It is clear to me, from the . . . comprehensive presentation made here and based upon the evidence that . . . [Castano] omitted significant facts and that from the evidence in the letters, he repeatedly, pre-2009 proffer, gave reasons why he was omitting some and advancing others. . . . His omissions are accordingly viewed . . . as being intentional and certainly material with respect to omitting significant portions of his own involvement in various of the criminal activities here and the criminal conspiracies involved. . . . There is no debate about the significance of material omissions standing alongside actual intentional false statements as qualifying for the admission of a statement that would otherwise be protected under the standards of the so-called *Kastigar* agreement.

Accordingly, the court granted the government's motion in limine and allowed it to use Castano's statements as evidence during the trial.

The jury then convicted Castano. Just before he was sentenced, nearly three years later, he filed a "Renewed Motion to Dismiss the Indictments for *Kastigar* Violations." The district court largely construed the motion as challenging the grand-jury phase of the case and deemed it untimely under Federal Rule of Criminal Procedure 12. Nevertheless, the court then proceeded to the merits and observed that the plain terms of the agreement—even assuming Castano had not breached it—precluded the government only from using his statements in its case-in-chief, and not during grand jury proceedings.

On appeal, Castano argues that the proffer agreement protected his statements from use during grand jury proceedings because the term "case-in-chief" was not defined, and it could "be construed differently[,] depending on the context[,]" to include grand jury proceedings. He further claims the district court's failure to conduct a pretrial hearing on his motion was reversible error

and relitigates the district court's factual finding that he materially breached the plea agreement. These lines of attack are not meritorious.

To begin, the district court correctly concluded that the government's promise not to use Castano's statements did not cover grand jury proceedings. We review this issue de novo to the extent that it turns on interpretation of the proffer agreement's terms. *See United States v. Shannon*, 803 F.3d 778, 783 (6th Cir. 2015). General principles of contract law dictate that we interpret the proffer agreement according to its plain meaning and give effect to its unambiguous terms. *See United States v. Fitch*, 964 F.2d 571, 574 (6th Cir. 1992) (citation omitted) ("[W]e are governed by normal 'contract law standards'" when interpreting proffer agreements).

The government's promise is set forth explicitly in the proffer letter:

> Except as otherwise specified in this letter, no statement made by you or your client during this proffer discussion will be offered against your client in the government's case-in-chief in any criminal prosecution of your client for the matters currently under investigation.

On appeal, Castano contends that "the presentation of evidence to a Grand Jury can be called the 'case-in-chief during Grand Jury proceedings' just like the presentation of evidence at trial can be called the 'case-in-chief during trial.'" Thus, he says that the contract is at least ambiguous because "case-in-chief" is susceptible to more than one meaning.

We disagree. The term "case-in-chief" does not render the agreement ambiguous. "Case-in-chief" is a term of art that refers to a trial, and not preliminary proceedings. *See Case-in-Chief*, BLACK'S LAW DICTIONARY (11th ed. 2019). It is not used to describe grand jury proceedings because they are one-party affairs without any defense or rebuttal. Accordingly, we agree with the district court that proffer agreement did not restrict the government's ability to use Castano's statements during grand jury proceedings.

Moving next to the government's use of Castano's statements at trial, proffer agreements are contracts, so "[t]he conditions which will constitute a breach . . . are governed by the agreement itself." *Fitch*, 964 F.2d at 574 (citation omitted). "[T]he government bears the burden of proving that the defendant failed to satisfy his part of the deal" and it "must prove that any breach was material and substantial." *Id.* "Although an inadvertent omission or oversight would not rise to the level of a materially false statement so as to constitute a breach of the agreement, a bad faith, intentional, substantial omission . . . does constitute a materially false statement and thereby a breach of the agreement." *Id.* (citation omitted and alteration in original). The district court made such a finding here, ruling that Castano's omissions were intentional and substantial, so his statements could be used against him. We review the district court's factual finding for clear error. *See United States v. Darwich*, 574 F. App'x 582, 594 (6th Cir. 2014).

Castano has not established that the district court's findings were clearly erroneous. He claims that he omitted mention of the 400-pound marijuana deal because he was not a member of the DDMC at that time. Yet Castano promised to provide the government "a complete and truthful statement of his knowledge of (and role in) the matters under investigation"—which was not limited to conduct that occurred while *he* was a DDMC member. And evidence of Castano's intentional omission of this information can be drawn from a letter he wrote to his girlfriend while incarcerated, where he discussed how he had not given any information on Mastromatteo in his earlier proffer because he "still consider[ed] Mike a friend."[1] Based on this evidence, the district

---

[1] Castano also claims that his proffer was for a limited duration so he could not have given all of the information he knew in a single interview, and thus did not materially breach the agreement. However, the district court found that Castano intentionally protected DDMC members like Mastromatteo, so the duration of the proffer is inconsequential—no matter how long the interview went, Castano would not have provided the material information now at issue.

court could reasonably infer that Castano once again withheld material information to protect Mastromatteo. Thus, it did not clearly err by determining that Castano's decision to withhold information about this drug transaction was an intentional and substantial breach of the proffer agreement.

2.

In addition to his many arguments stemming from the alleged breach of the proffer agreement, Castano also claims that the district court abused its discretion by denying his motion to dismiss the indictment for vindictive prosecution and/or outrageous government conduct.[2] He theorizes that he was indicted in these cases as retribution for his successful appeal of his conviction for possession of a firearm during and in relation to a drug trafficking crime, which we vacated because of a faulty jury instruction. *See Castano*, 543 F.3d at 828. The government opted not to retry Castano, and the district court resentenced him to 42 months' imprisonment after declining to impose an upward variance for obstruction of justice that the government had requested, based on a threatening letter Castano wrote to Vern Rich while incarcerated. Several years later, the government charged various members of the DDMC, including Castano, with offenses relating to perjury and obstruction of justice, which arose from Castano's earlier trial. The government included the Castano-to-Rich letter as an overt act in furtherance of the RICO conspiracy.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982)

---

[2]To the extent that Castano makes a freestanding claim of "outrageous government conduct," the district court correctly observed that there is no such thing recognized in our caselaw. On appeal, Castano does nothing to refute that conclusion and instead repackages his grievances regarding the 2006 trial and the government's supposed misuse of his proffer testimony.

(citation omitted). "A showing of vindictive prosecution requires (1) an exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right." *United States v. Meda*, 812 F.3d 502, 510 (6th Cir. 2015). The "Due Process Clause is not offended by all possibilities of increased punishment, only by those that pose a realistic likelihood of vindictiveness." *United States v. Roach*, 502 F.3d 425, 443 (6th Cir. 2007) (alterations and citation omitted).

Castano compares his case to *United States v. Eddy*, 737 F.2d 564, 565 (6th Cir. 1984), where the defendant was first acquitted with making a false statement to a federally insured bank, and then tried for perjury based on the statements he made at the first trial. There we concluded that there was "a realistic likelihood of vindictiveness in the institution of [the] perjury prosecution" because some of the alleged perjured statements were "literally true" and others were so "obscure" as to be "inherently confusing and vague." *Id.* at 572. Thus, we observed that the alleged perjury was not "manifest," and when "combined with the knowledge that the initial criminal charges against Eddy resulted in" his acquittal, the factual predicate raised a presumption of vindictiveness which the government had not rebutted. *Id. Eddy* has no bearing here. Unlike that case, Castano was still convicted on some of the original criminal charges, and the government has never attempted to try Castano again under § 924(c).

Additionally, we find no merit in Castano's unsupported factual claim that the government intentionally "waited to charge Castano with crimes in both cases until [he] successfully appealed his § 924(c) conviction." While it is true that some of the charges under review arose out of the earlier legal proceedings, that fact alone falls well short of demonstrating a realistic likelihood that the prosecutors' actions were vindictive. Instead, as the district court noted, Castano fails to

account for the fact that the government was engaged in a sprawling, decade-long investigation into the DDMC criminal enterprise, and that he was likely going to be prosecuted at the culmination of that investigation whether or not his § 924(c) conviction was vacated. Finally, the district court's failure to hold a hearing before trial was at most harmless because it hinges upon Castano having made a showing of a realistic likelihood that he was being prosecuted for successfully appealing his § 924(c) conviction, which he has not done.

We affirm the district court's order denying Castano's motion to dismiss for vindictive prosecution.

C.

The last pretrial issue for review regards Witort's Sixth Amendment right to counsel. Approximately two months before trial, Witort's family retained new counsel, Byron Pitts and Phillip Comorski, to take over his defense from his court-appointed attorney, Kimberly Stout. To that end, Pitts and Comorski filed a stipulation to substitute-in as counsel of record. After a hearing and additional briefing, the district court allowed the attorneys to appear in the case to assist in Witort's defense. It did not, however, allow Stout to withdraw from the case. Instead, it ordered Pitts and Comorski not to "interfere [with] or impede in" Stout's direction of the defense. Witort now claims that this arrangement, to which he did not object, violated his Sixth Amendment right to counsel.

The Sixth Amendment guarantees "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006). Deprivation of the right to counsel-of-choice is structural error that does not require a showing of prejudice or that the counsel defendant received was ineffective. *Id*. at 148–50. Witort fails to consider, however, that this right "is circumscribed in several important respects." *Id*. at

144 (citation omitted). Among these limitations is the trial court's discretion "in balancing the right to counsel of choice against the needs of fairness" and "the demands of its calendar." *Id*. at 152. We review a district court order denying a motion for substitute counsel for an abuse of discretion, *see United States v. Chambers*, 441 F.3d 438, 446 (6th Cir. 2006), and we generally consider the timeliness of the motion, the adequacy of the district court's inquiry into any alleged conduct between attorney and client, the extent of the alleged conflict, and the public's interest in the prompt and efficient administration of justice, *see United States v. Powell*, 847 F.3d 760, 778 (6th Cir. 2017).

The factors do not weigh in Witort's favor. His motion was not timely; it came about two months before trial, after his appointed counsel had expended hundreds of hours working on his defense, and too late to ensure that the trial date would not be continued for all six defendants. *See, e.g.*, *Chambers*, 441 F.3d at 447 (finding untimely a motion for substitute counsel brought one-and-a-half months before trial). Second, the district court conducted an adequate inquiry into Witort's rationale for seeking substitute counsel, even if it did not hear directly from him. Stout, Pitts, and Comorski all agreed that the attorney-client relationship between Stout and Witort had not broken down, and that a breakdown was not the impetus for seeking substitution of counsel. *See United States v. Marrero*, 651 F.3d 453, 466 (6th Cir. 2011) ("[A] defendant's differences of opinions with his attorney do not create a complete breakdown of communication that compromises his defense."). This likewise means that the third factor weighs against Witort because there was no claim that Stout and Witort had a "total lack of communication" which would prevent "an adequate defense." *Powell*, 847 F.3d at 778. Finally, the public interest weighed against Witort because the prompt administration of justice would have been hindered by any delay of the trial—a particularly weighty concern here, where the trial was expected to last months, and

-18-

the other defendants had already been detained for two years or more awaiting their trial date. Accordingly, the district court did not abuse its discretion by denying Witort's request for substitution of counsel on the eve of trial and instead allowing his newly retained counsel to assist in his defense.

III.

We turn to the bulk of the issues on appeal—the district court's evidentiary rulings; the sufficiency of the evidence supporting defendants' convictions; the district court's jury instructions; and the government's conduct in prosecuting these cases.

A.

We begin with defendants' numerous challenges to the district court's evidentiary rulings, which we review for an abuse of discretion. *See United States v. Mack*, 808 F.3d 1074, 1084 (6th Cir. 2015). "When reviewing for abuse of discretion, we view 'the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Deitz*, 577 F.3d 672, 688 (6th Cir. 2009) (quoting *United States v. Jackson*, 473 F.3d 660, 668 (6th Cir. 2007)). The question is not whether the evidence is prejudicial, but whether it is unfairly so. Unfair prejudice "does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986). "We reverse only where the district court's erroneous admission of evidence affects a substantial right of the party." *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (citing Fed. R. Evid. 103(a)).

1.

The operative indictment charged several violent felonies as predicate acts of the conspiracy: the murder of Charles Isler at the Cadillac Chapter clubhouse; the murders of William Bausch and Thomas Thacker in Indiana; and a violent attack on five members in Arizona dubbed the "Box Canyon Incident." Defendants raise discrete issues regarding the admission of evidence about these crimes.

a.

In 1993, DDMC member William Bartell murdered Charles Isler at the Club's Cadillac, Michigan clubhouse after Isler complained about the quality of drugs he had purchased. Club members then moved and buried Isler's body. Bartell was eventually convicted of second-degree murder and three others were convicted of obstruction of justice, conspiracy, and being an accessory after the fact to murder.

Vandiver contends this evidence was more prejudicial than probative and thus should have been excluded under Federal Rule of Evidence 403. However, he objected below to this evidence on hearsay grounds only. Having lodged only that specific objection below, we review his newly raised Rule 403 challenge for plain error.[3] *See United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989). Plain error means: "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected [the defendant's] substantial rights; and (4) the error seriously affected the fairness,

---

[3]Vandiver concedes he did not object on this ground, but argues for abuse-of-discretion review nonetheless because, he contends, making that objection during trial would have been futile given the district court's subsequent resolution of his motion for a judgment of acquittal. He cites no caselaw for the proposition that a substantive Rule 29 motion retroactively preserves an evidentiary challenge, which would run counter to Federal Rule of Evidence 103(a)(1)'s requirement that a party "timely object[ ]" to the admission of evidence, with specificity, in order to preserve an issue for appeal.

integrity, or public reputation of the judicial proceedings." *United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir. 2008) (citation omitted).

Here, evidence of this charged predicate act was relevant to the RICO enterprise and its violent proclivities. Having only generically identified a purported prejudicial effect and given the applicable standard of review—viewing the evidence in light most favorable to the government, maximizing its probative value and minimizing its prejudicial effect, *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984), and only finding unfair prejudice if the evidence "suggest[s] decision on an improper basis," *Mendez-Ortiz*, 810 F.2d at 79—we discern no plain error.

b.

In 1995, the DDMC kicked out one of its Indiana members, William Bausch. And consistent with the Club's practice for handling members "in bad standing," it took Bausch's motorcycle from him. Bausch stole it back. This prompted a visit from Larry Morgan, the warlord of the Grand Rapids chapter. Morgan executed Bausch in front of Thomas Thacker, the Indiana chapter's warlord. Morgan then directed a recruit to drive Morgan and Thacker to a party. Along the way, Morgan shot and killed Thacker. Why? Because "[t]hat son-of-a-b---h saw [him] kill" Bausch. Morgan was subsequently convicted of both murders.

As part of its case-in-chief, the government sought to admit several autopsy pictures of Bausch and Thacker. The district court concluded the pictures were admissible over defendants' Rule 403 objections. In its view, the photographs supported the government's theory that the murders were "highly directed, assassination-type murders" and were "not highly inflammatory or grisly as crime scene photographs go."

Drozdowski contends the district court improperly weighed Rule 403's prejudicial inquiry when it commented that those who have "tried murder cases . . . [have] seen a great deal worse than this." We disagree. The pictures are not particularly gruesome, *see, e.g.*, *United States v. Brady*, 595 F.2d 359, 361 (6th Cir. 1979), and even if they were, "[e]vidence is not unfairly prejudicial simply because it is gruesome or disturbing," *United States v. Boyd*, 640 F.3d 657, 667–68 (6th Cir. 2011) (collecting cases). They demonstrate a predicate racketeering activity that fits within the modus operandi of the RICO enterprise—the Club used brutal violence (here executing two individuals at close range) to show its exercise of control over members. Moreover, Drozdowski offers no specific argument as to why these pictures would tend to suggest a decision on an improper basis, other than arguing generically that bad pictures would make jurors think bad things. For these reasons, the district court did not abuse its discretion in concluding that these pictures were not so unfairly prejudicial to warrant exclusion.

c.

In 2003, five members of the DDMC Tucson, Arizona chapter tortured a woman affiliated with the Hells Angels Motorcycle Club. The president of the Hells Angels Arizona chapter threatened reprisal, so an Arizona Diciple contacted Smith, who decided to "take care" of the rogue DDMC members. Numerous DDMC members (including Witort) showed up at the Tucson clubhouse and violently attacked the five perpetrators—they were restrained, tased, and beaten with bats (and one had cigarettes put out on his face). The group then loaded the five into a pickup, and individually dumped them in a remote desert area known as "Box Canyon."

The government offered into evidence photographs of the five victims receiving medical care, which showed the individuals with neck braces, supplemental oxygen, intubation tubes, black eyes, blood, and scratches. After this incident, Smith called the attackers and congratulated them

"on a job well done." He also announced at a national DDMC meeting that this "Box Canyon incident" occurred because the victims "did something that they shouldn't have done to a Hells Angels' [woman]." And Smith was not the only one who spread the word to DDMC members about the attack—a leader of the Alabama chapter sent an email to several DDMC members, including defendant Rich, that detailed the attack and its aftermath. The email thanked those who perpetrated the attack for the "good job," and announced that the five victims were "out [of the Club] for good."

Vandiver contends the probative value of this evidence was substantially outweighed by its danger of unfair prejudice because it "did nothing more than make the Defendants look like bad men" and therefore should have been excluded under Federal Rule of Evidence 403. But as with his argument concerning the Cadillac murder, he did not object on this ground below, so we again review for plain error. *Evans*, 883 F.2d at 499. There was no error, plain or otherwise. Evidence of the Box Canyon attack was relevant to a specific racketeering act charged in the indictment and showed how the conspiracy furthered the criminal enterprise by committing violent acts to maintain order, discipline, and standing both within the DDMC and in the eyes of others (like the Hells Angels). This evidence was thus highly probative, and not unfairly prejudicial because the brutal, violent acts perpetrated by the DDMC members were at the core of the Club's modus operandi.

Drozdowski similarly submits that the admission of the entire incident was unduly prejudicial, arguing that it reflected a retributive act planned and perpetrated by the original victim's husband unrelated to the DDMC's goals. Through this prism, he contends the district court erred in admitting the evidence because "the jury was subjected to hours of testimony and dozens of bloody photographs." But other than generic assertions, he offers no argument as to

why the introduction of the evidence regarding the incident (and not Drozdowski's framing of it) was so unfairly prejudicial under Rule 403. Accordingly, his appeal of this issue is forfeited. *See, e.g.*, *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016) (repeating the oft-cited proposition that it is not up to the court to put flesh on the bones of a skeletal argument). Nor does he engage with the district court's reasoning for admitting the evidence in the first place: "as a part and parcel of the RICO activities of the entity" and because the pictures were "equivalent to medical records" and not "inflammatory or gratuitous." Failing to advance "any sort of argument for the reversal of the district court[ ]," *Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007), or "cogent" the-district-court-got-it-wrong analysis, "constitutes abandonment," *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016). This notwithstanding, we see no reason to disturb the district court's admission of this evidence given its highly probative and minimally prejudicial value.

2.

Defendants next challenge the district court's admission of evidence under Federal Rule of Evidence 801(d)(2)(E)'s exclusion from hearsay of a "statement . . . offered against an opposing party . . . [that] was made by the party's coconspirator during and in furtherance of the conspiracy." To fall within this exception, the government must demonstrate by a preponderance of the evidence that the co-conspirator's statement was made in furtherance of the conspiracy, *United States v. Bailey*, 973 F.3d 548, 560–61 (6th Cir. 2020), which "turns on the context in which it was made and the intent of the declarant in making it," *United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009). This is a question of fact, and we review the district court's determination that the government has met this standard (which is sometimes referred to as "an *Enright* finding," *see United States v. Enright*, 579 F.2d 980, 986–87 (6th Cir. 1978)) for clear error. *Warman*, 578 F.3d

at 335. But the decision to admit the evidence under 801(d)(2)(E) is still reviewed for abuse of discretion. *United States v. Kone*, 307 F.3d 430, 440 (6th Cir. 2002).

Before trial, defendants moved to require the government produce a written proffer setting forth the basis for admission of co-conspirator statements and for the district court to, consistent with our decision in *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979), conduct a "mini-hearing" on each statement and determine its admissibility. The district court denied the motion and instead opted for a different option also approved by *Vinson*—it conditionally admitted the statements, granted a standing objection to their admission, and then concluded it would revisit the decision at the end of the government's case-in-chief. *See id.* at 153. After the close of the government's proofs, defendants moved for a mistrial based on their claim that the government did not meet its burden for the admission of the 170 specific statements. The district court denied the motion on the grounds that the statements were either not hearsay or properly admitted under 801(d)(2)(E). Defendants raise three issues with this conclusion on appeal.

a.

First, Smith lodges a procedural challenge to the district court's *Enright* findings. He broadly asserts that the district court's lengthy findings were not specific enough, incorporates by reference the 170 statements the defendants identified below, and says the district court erred because it did not "address[] the specific statements objected to." Other than this, Smith does not set forth any argument as to why any or each of those statements were improperly admitted.[4] We can make quick work of Smith's argument.

---

[4]In reply, Smith advances a new argument—that the hearsay statements regarding the Indiana and Cadillac murders were inadmissible because there was no conspiracy involving the tried defendants at the time of those murders. We typically do not entertain arguments raised for

We prefer that district courts make "specific *Enright* findings," and have reversed district courts when their findings are either "nonexistent or completely conclusory." *United States v. Martinez*, 430 F.3d 317, 328 (6th Cir. 2005) (collecting cases). But we have also found conclusory findings to be satisfactory and that "no specific findings [are] required where the conspiracy alleged involved many acts and people, and [when we are] able to say with confidence that the government met its burden." *United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993) (citation omitted). We also do not "mandate[] a particular degree of specificity with respect to the *Enright* findings." *Kone*, 307 F.3d at 441. And we have historically condoned broad, sweeping findings by a district court in the face of a defendant's challenge that the district court needed to say more with respect to its factual findings. *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998). For example, we approved in *Maliszewski* this finding by the district court as adequate:

> I find in the first place the evidence overwhelmingly shows the existence of conspirators here. The evidence overwhelmingly supports the maker of these various statements produced through the course of this trial as being a member of the conspiracy. The statements in each respect were made during the course of or in furtherance of a conspiracy and all of this I find by a preponderance of the evidence or more. Each of these statements is permitted because it is not hearsay under 801(d)(2)(E).

*Id.* (ellipsis omitted).

Here the district court's *Enright* findings went far beyond those condemned as "nonexistent or completely conclusory." *Martinez*, 430 F.3d at 328. Sure, it did not walk through each of the 170 statements line by line, but we do not require a district court to provide a detailed explanation of its evidentiary rulings. *United States v. Curro*, 847 F.2d 325, 329 (6th Cir. 1988). We have

---

the first time in reply, *see United States v. Galaviz*, 645 F.3d 347, 362 (6th Cir. 2011), and see no reason to do so today. Moreover, for reasons expressed elsewhere in this opinion, the substantive no-conspiracy argument is without merit.

also, and repeatedly, held that a "party is not allowed to incorporate by reference into its appellate brief the documents and pleadings filed in the district court." *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 710 (6th Cir. 2006). This is exactly what Smith has done here, telling us that we should go looking below for the specific statements to which he objects. That "does not comply with the Federal Rules of Appellate Procedure." *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003); *see also* Fed. R. App. P. 28(a)(8). And regardless, the district court's findings here were much more specific than the conclusory finding we condoned in *Maliszewski*. Smith's position on appeal is without merit.

b.

McKeoun takes a more substantive approach and argues the district court impermissibly admitted hearsay testimony regarding Bartell's murder of Isler in Cadillac. Testimonial evidence relating to that murder came by way of DDMC member Mike Mastromatteo. He testified that he "heard" about the murder and the members' subsequent attempted coverup of it "through brothers . . . in the Devils Diciples," including from his friend "Batman." McKeoun contends this testimony should not have been admitted because the government did not offer any proof as to when the hearsay statements were made, the context in which they were made, and how they furthered the conspiracy. Thus, he claims, the statements were just mere "idle chatter" and therefore were inadmissible. We disagree.

We have held that "mere 'idle chatter or casual conversation about past events' is not considered a statement 'in furtherance of the conspiracy.'" *United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003) (citation omitted). And we have made sure to emphasize that "out-of-court statements made *after* the conclusion of the conspiracy are not made 'in furtherance of the conspiracy'" and thus found error when the record does not demonstrate a statement's context or

timing for purposes of determining whether it qualifies under Rule 801(d)(e)(E). *See United States v. Conrad*, 507 F.3d 424, 430 (6th Cir. 2007). But as the district court concluded and government ably demonstrates on appeal, that is not what we have here. Bartell's murder of Isler in Cadillac fits squarely within the enterprise's take-care-of-our-own and violence-as-a-means-to-the-ends approach. Moreover, testimony about the murder and club members' subsequent attempted coverup cannot be cast aside as "idle chatter or casual conversation about past events," *Warman*, 578 F.3d at 338 (citation omitted)—at a minimum, it identified participants and their conspiratorial roles, *Bailey*, 973 F.3d at 561, and displayed the Club's efforts to avoid law enforcement.

c.

Finally, Rich challenges the district court's admission under 801(d)(2)(E) of the email that an Alabama club leader sent following the Box Canyon incident. He too picks up on our idle-chatter caselaw and says that the email was just a narrative rehashing of a past event and thus did not further the conspiracy. *See Darwich*, 337 F.3d at 657. But as the district court recognized, this email did not just convey historical fact—it can be rationally read to identify those who participated in the assault and to warn others that taking actions inconsistent with the Club's rules and objectives would lead to swift and violent punishment. And this is of a piece with other statements we have found to satisfy Rule 801(d)(2)(E), such as the identification of other co-conspirators and their roles, *Bailey*, 973 F.3d at 561, keeping co-conspirators "abreast of a co-conspirator's activities," *United States v. Franklin*, 415 F.3d 537, 552 (6th Cir. 2005) (citation omitted), or promoting the conspiracy's objectives, *Warman*, 578 F.3d at 338.

3.

The next evidentiary issue concerns Special Agent Fleming. He is the FBI case agent who oversaw the government's investigation of the DDMC (and his affidavit supported the Title III

wiretaps discussed above). Fleming testified several times during the trials about those recordings under Federal Rule of Evidence 701, which allows certain opinion testimony by a lay witness. Relying on *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), defendants contend the district court abused its discretion by admitting his opinion testimony without a proper foundation.

a.

Only a few interpretations of the numerous recordings that Fleming testified about are at issue here. First, Fleming testified regarding controlled buys made by a cooperating witness, John Pizzuti, and recordings captured via wiretaps on DDMC member's Vern Rich's telephone. After Pizzuti testified about purchasing methamphetamine from DDMC members, including from Vern Rich and Vandiver, Fleming testified about some of those recordings around the controlled buys. The prosecutor had this exchange with Fleming after playing those recordings to the jury:

> Q.   Based upon the context of the call, as well as the investigation that was going on at that time, what did you understand Mr. Rich to be referring to when he said, "it's here now"?
>
> A.   In my opinion, Mr. Rich is telling Mr. Pizzuti that he got a new shipment of methamphetamine that he has, and is willing to sell it.

The government then played a call from Rich to another DDMC member, John Riede, which Fleming interpreted as "Mr. Rich is telling Mr. Riede that he's trying to make a sale of methamphetamine and that he wants to get the money to Mr. Riede before he leaves." Several days later, Riede called Rich, and Fleming offered his interpretation of this call to the jury:

> A.   Mr. Rich is telling Mr. Riede that he's got a lot of money. When he uses the term, he wants to get this out of his pocket, he's got a lot of money that he wants to get to Mr. Riede. And in the same token, when he says he probably wants to do that, do that again, meaning he needs to refresh his supply of methamphetamine that he can get from Mr. Riede.
>
> So he can kill two birds with one stone. If they meet, he can give him the money that he's got that he owes Mr. Riede for methamphetamine. In return,

> Mr. Riede can give him additional methamphetamine. Mr. Riede says, "things are real right," meaning he's fresh with methamphetamine and they can kill two birds with one stone.

Q. And is that your opinion, based upon your investigation in this case, and your review of all of the calls in this case?

A. Based upon that and my experience working drug investigations, yes.

No defendant objected contemporaneously to this testimony. But after recess, defendants objected "to the continued testimony of Officer Fleming as it relates to his giving his opinion after interpreting the phone calls." The district court denied the motion but admonished the government to "do its level best to lay an appropriate foundation" and said it would consider future *Freeman* objections on an as-objected-to basis.

The only other testimony defendants point to came after this oral ruling. The government elicited testimony from Jaime Franks, a methamphetamine cook for the DDMC. She testified about how she made methamphetamine with Vandiver (including how they sourced pseudoephedrine) and that the pair was arrested for possessing methamphetamine following a cook. The government then put Fleming on the stand to testify about wire intercepts relating to Franks and suggested (over defendants' objections) that the call was "related to the manufacturing of methamphetamine involving Mr. Vandiver and Mr. [McKeoun]."

b.

Federal Rule of Evidence 701 provides that a lay witness may offer opinion testimony provided it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." We permit such opinion testimony "because it has the effect of describing something that the jurors could not otherwise experience

for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *Freeman*, 730 F.3d at 595 (citation omitted).

We have both condoned and condemned law enforcement officials' opinion testimony regarding intercepted communications. On the one hand, "there is a risk when an agent provides interpretations of recorded conversations based on his knowledge of the entire investigation that he is testifying based upon information not before the jury, including hearsay, or at the least, that the jury could think he has knowledge beyond what is before them." *Id.* at 596 (internal quotation marks, brackets and ellipsis omitted). But on the other hand, an agent's opinion can aid the jury: "an investigator who has accumulated months or even years of experience with the events, places, and individuals involved in an investigation necessarily draws on that knowledge when testifying; indeed, it is those out-of-court experiences that make the witness's testimony helpful to the jury." *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (citation omitted).

*Freeman* is the exemplar of when the risks have been realized. There, an agent provided "his personal impressions" of numerous phone calls in a murder-for-hire case. 730 F.3d at 594. We found foundational fault with his testimony because he "repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole" without "specif[ing] *personal* experiences that led him to obtain his information but, instead, repeatedly relied on the general knowledge of the FBI and the investigation as a whole." *Id.* at 596. And we also pointed out that the agent did not testify about being present for the surveillance yet implied to the jury that he was "better situated to interpret the words used in the calls than they were" because he had listened to "all of the calls." *Id.* at 597. So, we concluded, the agent "failed to explain the basis of his interpretations—what experience he had that the jurors themselves did not have—and therefore failed to lay a foundation under Rule 701." *Id.*

*Kilpatrick* is on the other end of the spectrum. The agents there extensively testified about the meaning of text messages in a public-corruption case involving the former Mayor of Detroit and a city contractor. 798 F.3d at 377–78. We rejected the defendants' analogy to *Freeman* and concluded the district court there did not abuse its discretion in admitting the testimony under Rule 701 for many reasons, including that the government laid the proper foundation for those agents' testimony:

> They did not merely cite to the collective knowledge of their respective agencies as the source of their information. Each agent testified on multiple occasions concerning his or her years-long personal involvement in the case, including interviewing dozens of witnesses, reading scores of relevant documents and thousands of text messages, and listening to recorded phone calls.

*Id.* at 381.

This case is not, as defendants suggest, *Freeman* revisited. Indeed, the district court's comprehensive opinion more than adequately details why Agent Fleming's testimony did not run afoul of Rule 701 and we adopt it as our own. *See United States v. Sutherland*, 2014 WL 7338724, at*2–3 (E.D. Mich. Dec. 22, 2014). Defendants' arguments on appeal do nothing to alter the district court's persuasive analysis, so we dispense with them in a conclusory fashion.

Witort says, based on the excerpted call between Rich and Pizzuti, that Fleming's testimony was improper because he "clearly state[d] that his interpretations were based on the entire investigation in this case" and because he did not participate in the calls or observe the relevant conduct. But because this testimony went unobjected to (it was before defendants filed their motion), we review here for plain error. And given Fleming's extensive involvement in the investigation—which was thoroughly detailed by the district court—*Freeman*'s investigation-as-a-whole concern does not arise.

McKeoun takes issue with Fleming's testimony concerning Vandiver, McKeoun, and Franks. Given that defendants lodged a proper objection, our review of this statement is for abuse of discretion. McKeoun's argument is conclusory. Other than detailing the call and criticizing Fleming's interpretation of it (about which he was able to cross-examine Fleming), McKeoun does not say why Fleming lacked foundation to say he believed the call was related to the manufacture of methamphetamine. Instead, he lays the blame at the district court's explanation for why it satisfied the foundational element. But as set forth above and in the district court's opinion, Special Agent Fleming plainly had first-hand knowledge of the investigation and the wire-intercepts at issue. The district court correctly concluded the risks identified in *Freeman* played no role here.

That leaves us with Vandiver's undeveloped argument that Fleming's lengthy tenure with the investigation did not establish sufficient foundation. Having offered no specific criticism of the district court's reasoning or identified any specific instances of objectionable testimony on appeal, we deem his argument forfeited. *Hendrickson*, 822 F.3d at 829 n.10.

4.

Drozdowski takes issue with the admission of a photograph of him brandishing two handguns, which the district court found relevant to the DDMC's violent proclivities and not unduly prejudicial. He ties his argument not to its admission per se, but rather to how the government used that *gun*-possession evidence in its closing argument; it tied that picture to his charge of being a felon in possession of *ammunition*. Drozdowski's challenge here conflates whether the district court properly admitted the evidence with whether the prosecutor engaged in misconduct by making a statement not "based on the evidence in the record." *United States v. Davis*, 514 F.3d 596, 613 (6th Cir. 2008) (citation omitted). In any event, the firearm picture was plainly relevant for the reasons set forth by the district court, and the district court did not abuse

its discretion in finding that its relevance was not substantially outweighed by its prejudicial impact. And to the extent the prosecutor committed misconduct by tying his possession of the firearms to his ammunition charge, as discussed below in examining his sufficiency-of-the-evidence argument, the evidence supporting his felon-in-possession-of-ammunition charge was overwhelming so the firearm picture could not have "substantially swayed" the jury's verdict. *United States v. Hardy*, 228 F.3d 745, 751 (6th Cir. 2000).

5.

The next evidentiary issue stems from Special Agent Fleming testifying that, during a search of former DDMC national vice president Ken Roll's house, the government found the results of a polygraph administered by the FBI on a former DDMC member. The actual polygraph was not admitted into evidence. Witort contends that the reference to the polygraph denied him a fair trial because polygraph evidence is generally inadmissible. The problem with his argument, as the government notes, is that our polygraph caselaw focuses on the reliability issues surrounding the results of polygraphs, *see Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir. 1987), and not on whether one was administered, *see United States v. Weiner*, 988 F.2d 629, 633 (6th Cir. 1993). Here, the government introduced evidence only that a DDMC member had in his possession a polygraph exam of another DDMC member. Because it did not introduce the results of that exam, this issue is meritless.

6.

Defendants' last evidentiary challenges relate to limits imposed by the district court during cross-examination.

The Sixth Amendment guarantees the right of a criminal defendant in a state or federal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also*

*Crawford v. Washington*, 541 U.S. 36, 42 (2004). Cross-examination is a "primary interest" secured by the Confrontation Clause and "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (citation omitted). A criminal defendant's confrontation rights are not limitless, however. "[T]rial judges [may] . . . impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Where "it is merely the extent of cross-examination that is limited," the Confrontation Clause question is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (citation omitted). Under this standard, it is only when "the defense is not allowed to plac[e] before the jury *facts* from which bias, prejudice or lack of credibility of a prosecution witness might be inferred," *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (first alteration in original) (citation omitted), that "there is indeed a denial or significant diminution of cross-examination that implicates the Confrontation Clause," *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000). We review a claim that the admission of evidence violates the Confrontation Clause de novo. *Mayberry*, 540 F.3d at 515.

a.

In 2000, southeast Michigan law enforcement agencies formed a task force to investigate a murder. Special Agent Fleming was part of that task force and took part in interviews of two teenage suspects, Jonathan Kaled and Frank Kuecken. Those two falsely confessed to the murder. After exoneration, they filed a civil-rights complaint against numerous defendants involved in their prosecution (but not Fleming). *See Daniels v. City of New Baltimore*, No. 01-cv-73902 (E.D.

Mich. 2003).  As pertinent here, the district court in that litigation denied qualified immunity to the individual defendants on the plaintiffs' 42 U.S.C. § 1983 claims.  Although Fleming was not a party, defendants suggest the *Daniels* district court viewed him as an "unindicted co-conspirator" because of the following line from its summary-judgment opinion: "The Court disagrees with Defendants Bugbee and Horton, and finds that there is sufficient circumstantial evidence to allow a jury to find that Defendants Bugbee and Horton *conspired with the other Defendants* to violate Plaintiff Kaled's and Plaintiff Kuecken's constitutional rights."  (Emphasis added).  That same paragraph discussed the roles of other defendants:

> [A] jury could find that Defendants Esser and Borowicz told Plaintiff Kaled which facts to confess, and that Defendants Bugbee and Horton gave Plaintiff Kuecken the facts that he should confess.  Moreover, given the undisputed high-profile nature of this murder, the jury could reasonably infer that the task force would have [had] a motive to conspire; the jury could find that the task force was under public pressure to find someone—anyone—to blame for this murder, and that these Plaintiffs seemed like good people to blame.

Defendants here sought to question Fleming about his role in allegedly assisting in procuring the false confessions, asserting it went to "his credibility for truthfulness and how he went about [the DDMC] investigation [was] at issue."  The district court limited questioning to Fleming's general investigative methods but ruled inadmissible specific questions concerning his role in interrogating Kaled and Kuecken.  Rich claims this was error requiring reversal, arguing that the record supports Fleming's conduct in the Kaled/Kuecken matter "was neither honorable, faithful to the Constitution or any genuine truth seeking effort" and thus defendants should have been able to cross-examine him about that matter to undermine his credibility.  We find no violation of the Confrontation Clause.

The discretion district courts possess to reasonably limit cross-examination on prejudicial topics of marginal relevance that could mislead the jury is great.  *Van Arsdall*, 475 U.S. at 679.

Here, the district court gave defendants the opportunity to extensively cross-examine Fleming's interrogation techniques in this case. How Fleming allegedly conducted an interrogation of two individuals fifteen years prior is irrelevant, especially given the lack of claims of false confessions or facts concerning impermissible interrogation tactics here. And despite the assertion to the contrary, there is no record evidence establishing Fleming conspired with the other defendants in the *Daniels* case, as that opinion limits that claim to defendants in that case (in which Fleming was not a party). Therefore, the jury "had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory" that Fleming was not credible. *Stewart*, 468 F.3d at 347 (citation omitted).

b.

Ronald Roberts was a DDMC member. He played a pivotal role in the Club's manufacturing and distribution of methamphetamine. He was also involved in several physical altercations and the theft of motorcycles. During defendants' cross-examination of Roberts, Drozdowski's counsel sought testimony regarding Roberts' purported role in a 2001 assault and murder, claiming it would impeach Roberts' credibility. But following the government's objection that it was improper impeachment evidence under Federal Rule of Evidence 609, Drozdowski's attorney withdrew his argument and offered the court an alternative:

> Let me file the reports [that purportedly substantiated the allegation] . . . and let the Court know exactly how this ties in, whether we should get into it. And we can always have him called back. . . . And we can always have him called back later, if the Court deems that I can go into this topic.

The district court agreed and confirmed it would provisionally sustain the objection as irrelevant and inadmissible under Rule 609. Neither Drozdowski's lawyer, nor any other defense attorney, provided the district court with the records or sought to recall Roberts during the trial. But eight

months after the jury issued its verdicts, Drozdowski's lawyer filed the records "[i]n order to complete the record, and negate the Government's implication that counsel did not have a good-faith basis on which to question Ronald Roberts regarding his participation in a 2001 murder."

Defendants Rich and Drozdowski contend the district court's limitation on the cross-examination of Ronald Roberts infringed upon their Sixth Amendment right to confrontation. However, the district court did not err, plain or otherwise. "Trial judges retain great discretion to impose reasonable limits on the cross-examination of witnesses based on concerns such as harassment, prejudice, confusion of the issues, the witness's safety, and marginal relevancy." *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005) (citation omitted). And this includes when a district court limits cross-examination in some respects while permitting defense counsel to explore "other benefits [a witness] was receiving from the government in order to highlight [the witness]'s bias in favor of the government." *Id.* at 361 n.5. The district court here made specific findings as to why it was not going to let defendants explore this topic—it was irrelevant with respect to Roberts' credibility and inadmissible under Federal Rule of Evidence 609 because there was no substantiation of a murder conviction. And its irrelevance finding—that it was a stale and unsupported assertion—is certainly supported under an abuse-of-discretion review, let alone plain error (given defendants did not renew their objection or file the reports until eight months after the trial ended). Moreover, defendants were given multiple avenues to attack Roberts' credibility, including by examining his history of lying to the FBI and the details of his cooperation agreement. *Id.* This claim is meritless.

c.

Anthony Clark was a member of another motorcycle gang, the Highwaymen. He provided extensive testimony about his dealings with the DDMC, which involved its distribution of

methamphetamine. But before providing this testimony, he told the jury of his RICO conspiracy conviction for his role as the national president of the Highwaymen. He was sentenced to 292 months in prison, but we vacated that sentence because it exceeded the statutory maximum, absent special findings by the jury. *See United States v. Nagi*, 541 F. App'x 556, 576–77 (6th Cir. 2013). While awaiting resentencing, the government approached Clark and asked him to cooperate in this case in exchange for the possibility of the government filing a motion for a reduced sentence under Federal Rule of Criminal Procedure 35. The terms of his cooperation agreement referenced a separate and ongoing investigation into the murder of Lon Butler (to which Clark was apparently connected), but "acknowledge[d that] there are no promises or other agreements regarding the disposition of that matter by the United States Attorney's Office." Over defendants' objection, the district court prohibited cross-examination that specifically referenced the alleged "homicide, murder, death, killing, assault, and the like," and instead allowed only questions about whether Clark was a person of interest in a "very serious criminal offense."

As they did with their arguments concerning the scope of cross-examination of Ronald Roberts, Rich and Drozdowski argue the district court's limitation here was an abuse of discretion because the introduction of the alleged murder would have shined light on his motive to testify—i.e., he was testifying for the possibility of avoiding a murder charge. We again disagree. The district court had wide latitude when imposing cross-examination limits, *Davis*, 430 F.3d at 360, and as above, the jury heard many reasons why Clark could have been motivated to give incriminating testimony against the DDMC, including that he was under investigation for other suspected criminal activity. The district court was well within its discretion to limit the inquiry.

B.

Defendants raise a host of sufficiency-of-the evidence challenges. A defendant claiming insufficient evidence to support a conviction "faces a high bar" on appeal. *United States v. Persaud*, 866 F.3d 371, 379–80 (6th Cir. 2017). This is because we must uphold a jury's conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We will sustain a conviction based on circumstantial evidence alone, and the evidence need not disprove every hypothesis except that of guilt. *United States v. Lindo*, 18 F.3d 353, 357 (6th Cir. 1994). When we consider a sufficiency claim, we do not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted). Rather, we "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Id.* (citation omitted).

1.

The substantive RICO offense makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). And under § 1962(d), it is unlawful "for any person to conspire to violate" § 1962(c). As examined further with respect to defendants' jury-instruction challenges, the elements of these two crimes are different: "Unlike a substantive RICO charge, a RICO conspiracy charge does not require proof that the defendant committed any predicate acts." *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008). Instead, the government need only establish a defendant "intended to

further 'an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense and it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005) (brackets omitted) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Defendants raise multiple arguments regarding the evidence supporting their RICO conspiracy convictions (Count 1).

a.

RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). The Supreme Court has opined that an "enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Put differently, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). But it need not be rigidly structured in order to qualify given "[t]he breadth of the 'enterprise' concept in RICO." *Id.* at 949. So, to establish the existence of such an associated-in-fact enterprise, the government must only prove "an ongoing organization, formal or informal" and that "various associates function as a continuing unit" "for a common purpose." *Turkette*, 452 U.S. at 583.

Defendants challenge the existence of an enterprise, contending that individual DDMC members were engaged in illegal activities for their own interests and thus did not rise to the level of a "continuing unit." Darrah provides a useful analogy to sum up defendants' view of the evidence: "[E]veryone who engaged in the illegal activities alleged, engaged as independent contractors, not as a continuing unit."

The district court extensively discussed the evidence supporting the jury's enterprise finding when it denied defendants' motions for judgment of acquittal, focusing on the DDMC's top-down governance, use and distribution of methamphetamine, and frequency of gambling activities, theft, and violence. This reasoning is well supported by the record. Consider the government's expansive evidence concerning the Club's hierarchical approach to manufacturing and distributing methamphetamine. Numerous members testified about how they had to pay "taxes" up the chain to Club leadership and that Darrah was especially active in collecting these "taxes."[5] William Smith's testimony is but one example of this. He testified about having to "kick up" money to Ken Roll (then the DDMC National Vice-President) and ultimately to Jeff Smith based on his entire drug business, even the portion that he established before he joined the DDMC. He explained:

> He would tell me on numerous occasions, he was like, "Hey, you're going to have to start kicking before they start making you kick."
>
> I was like, "What do you mean kick? I had this way before that." They are like, "It don't matter. You're a Devil Diciple. By being that, if you don't start kicking, you're going to get taxed. And when you get taxed, it's going to be a whole lot more than you think it is."

He estimated he "kicked in" over $50,000 during his time.

The jury also heard many witnesses testify about how they manufactured, obtained, and distributed large quantities of methamphetamine, and how each of the defendants here played a role in those processes. For example, one of the Club's leaders of the Mount Clemens chapter, Mike Mastromatteo, was a large-scale methamphetamine dealer. Vandiver and a "boss" of the Alabama chapter attempted to shut down Mastromatteo's operation, telling him "[y]ou're not

---

[5]The taxes were not limited to drug sales, and also applied to the chapters' gambling operations.

dealing dope here anymore unless you go through us." Mastromatteo sought help from McKeoun, who vouched for him to Smith because Mastromatteo was "doing what [he was] supposed to" by providing drugs for parties and cash to members when needed. Or consider testimony from John Riede, who had to seek Smith's approval to purchase methamphetamine from Witort, and who told the jury that McKeoun wired money for that purchase. These are just two examples of the many ways the methamphetamine flowed in and out of the DDMC.

And that is just the drugs. The government also presented significant testimony regarding the DDMC's violent proclivities, spanning from its "black eye" policy to violent confrontations with former members and customers (including the Cadillac and Indiana murders and the Box Canyon incident) and even those thought to be rivals (Drozdowski's attack on a civilian, discussed below). The government also provided evidence of the DDMC's efforts to stifle collaboration with law enforcement through its "no snitching" policy and its proactive attempts to obtain information related to law enforcement's investigations. And as set forth in more detail below, the government entered into evidence the Club's illegal gambling activities.

Defendants' arguments on appeal are not persuasive, especially given the "high bar" they face. *See Persaud*, 866 F.3d at 379–80. Although they all pick at individual statements made by individual witnesses that they say establish nothing more than people making and dealing drugs independently and gathering for other own reasons, none engage with the evidence set forth above. In sum, sufficient evidence supports the jury's conclusion that an enterprise existed.

b.

Drozdowski and Witort challenge the sufficiency of the evidence supporting the association-with-the-enterprise element of their RICO conspiracy conviction. "The concept of 'association' requires both interpersonal relationships and a common interest." *Boyle*, 556 U.S. at

946 (brackets and citations omitted). We read this requirement, as with RICO's other terms, broadly. *Id.* at 944. So, we focus not on whether "each conspirator . . . participate[d] in every phase of the criminal venture," but rather on whether each conspirator gave "assent to contribute to a common enterprise." *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006) (citation omitted). And, as relevant here, we have found that a formal leadership role in an enterprise "more than satisfies RICO's loose association requirement." *United States v. Nicholson*, 716 F. App'x 400, 406 (6th Cir. 2017) (collecting cases).

The district court concluded Witort's association with the enterprise was well established, especially given he "was a member of the DDMC for more than 30 years and was president of the California chapter." As for Drozdowski, it concluded that the "[e]vidence at trial well supported the jury's conclusion that . . . Drozdowski w[as] associated with the DDMC enterprise" because he "became a patched member in 2010, in the Blue Water Chapter." These conclusions are well supported.

Witort argues that because he did not hold a formal leadership role within the DDMC, the government did not demonstrate he associated with it. But that reading conflicts with the Supreme Court's directive that we broadly interpret "association." *Boyle*, 556 U.S. at 944, 946. The jury heard testimony from other members that Witort "was a man with a lot of respect" within the Club; one who "ha[d] a lot of pull in the Devils Diciples," and was "the boss" of its California chapter. This testimony, along with the extensive testimony linking Witort to the Club's methamphetamine operation and the Box Canyon incident, supports the jury's associational finding for Witort.

Drozdowski makes a different argument, painting himself as a deadbeat DDMC member who just happened to "share" his methamphetamine at the Club's parties. But this self-portrait does not take the facts in the light most favorable to the jury's verdict. He was a patched DDMC

member, was viewed as "the next generation of Devils Diciples," and even had the Club's motto tattooed on his knuckles. He possessed various DDMC items, including a document listing DDMC "down brothers" (those in prison) and the bylaws of the Blue Water chapter, which listed him as "No. 3, . . . warlord." This, along with the evidence supporting his participation in the cooking and distribution of methamphetamine (and the attack on Robert McClure discussed below), amply supports the jury's finding here.

c.

McKeoun challenges the government's proof establishing a "pattern of racketeering activity."[6] A RICO conspiracy conviction requires the government to prove a "pattern of racketeering activity"—two predicate acts occurring within ten years of each other. §§ 1961(5), 1962(c). As pertinent here, "[t]he government [is] charged with proving that the predicate acts in connection with the conspiracy were related to its illegal purposes, and that these acts constitute a threat of ongoing criminal activity." *Corrado*, 227 F.3d at 554. Yet, RICO's pattern requirement is not defendant specific; the government "does not need to prove that the defendant committed or agreed to commit two predicate acts himself, or even that any overt acts have been committed." *Saadey*, 393 F.3d at 676. Put differently, "conspirators are liable for the acts of their co-conspirators" "so long as they share a common purpose." *Salinas*, 522 U.S. at 64. Thus, to demonstrate the pattern requirement for an individual defendant, all that is required is proof that "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the

---

[6]Witort's brief raises this issue in name only. He nominally contends that there was insufficient evidence as to the pattern element by repeating that the DDMC "was nothing more than various groups of men who were acting independent of one another" argument raised as it relates to the existence of an enterprise. Having failed to specifically challenge the predicate acts at issue, he has forfeited any review of this issue. *Hendrickson*, 822 F.3d at 829 n.10.

elements of a substantive criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65.

On appeal, McKeoun contends the government did not prove that he "conspired and agreed to . . . the murders in Michigan and Indiana." In his words, "[t]here was no testimony that McKeoun had anything to do with those murders or that McKeoun even knew about them." But that wholly misses the point of conspirator liability under RICO. It was sufficient to prove that McKeoun agreed to join the DDMC enterprise and agreed that a conspirator would commit two or more acts of the types of racketeering activity alleged. *United States v. Rios*, 830 F.3d 403, 434–35 (6th Cir. 2016). And the district court capably explained the link between McKeoun and the murders:

> The Government also presented evidence that DDMC members who left the organization in bad standing were often required to surrender their motorcycles to the club or have their property taken by force. When member Jeff Arnold left the group, McKeoun, Vandiver, and other DDMC members took Arnold's motorcycle. The Government offered evidence that, after leaving the club, Thomas Thacker was murdered by fellow DDMC members, and thereafter one of those murderers, William Bausch, was himself killed. The Government provided evidence showing that McKeoun, as well as other patched members of the DDMC, knew that the enterprise robbed and murdered members who refused to surrender their property after leaving the organization.

(Record citations omitted). In addition, as the district court also explained, McKeoun's active role in the DDMC and his meth distribution and manufacturing activity alone were sufficient to show McKeoun's agreement to join a conspiracy that involved a pattern of racketeering activity.

d.

Rich and Drozdowski next challenge the jury's drug-quantity findings pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The jury found Rich "agree[d] that at least 50 grams of Methamphetamine (or 500 grams or more of a mixture of a substance containing a detectable amount of Methamphetamine) was or would be involved in the conspiracy." Rich argues that the evidence does not support that finding (and it is worth noting he was not charged with conspiracy to manufacture, distribute, or possess with intent to distribute methamphetamine like the other defendants). But we, like the district court, disagree. Jeffrey Armstrong testified that he "fronted" "eight-ball amount[s]" of methamphetamine to Rich, which Rich would then turn around and sell. This occurred maybe "two or three times." Rich focuses on this testimony and says this "small amount"—three-eighths of an ounce equates to just over 10 grams— "fails to come close to any necessary threshold amount to support the jury['s] finding." But that is not all the jury was presented. They heard testimony that Rich was present when Darrah and his wife showed up at the Port Huron clubhouse with a "gallon-size bag" of methamphetamine, which was sampled by those present (with Rich's permission) and then sold. And more generally, they heard about the Club's extensive methamphetamine network, with Rich being a member of the Club since the 1980s. Given this, and the "high bar" that we apply to sufficiency-of-the-evidence challenges, we reject Rich's argument here.

The jury also made the same finding for Drozdowski for Count 1 (RICO conspiracy), Count 3 (conspiracy to manufacture, distribute or possess with intent to distribute methamphetamine), and Count 39 (aiding and abetting the manufacturing of methamphetamine). The record supports this conclusion. Indeed, we need only consider the testimony of Heather Kaster. She was a DDMC member's girlfriend and a bartender. Kaster convinced the bar's patrons to purchase at least one hundred boxes of pseudoephedrine for her. She would then give it to her boyfriend and Drozdowski for them to cook (and then distribute) methamphetamine. Each box

-47-

would yield about two grams of "uncut dope," and a final product yield of "four to six grams." These quantities alone more than establish the 50/500 grams requirement set forth in the jury's findings, irrespective of Drozdowski's position that "uncut" methamphetamine does not necessarily mean "pure" methamphetamine. (We also note Kaster was not the only one who linked Drozdowski to cooking methamphetamine. Consider, for example, Jesse Williams' testimony that he cooked methamphetamine maybe 10 to 20 times with Drozdowski, with each cook requiring four boxes of pseudoephedrine and yielding about 5-6 grams).[7] This claim is not well taken.

2.

Smith, Darrah, and Witort challenge the sufficiency of the evidence supporting the jury's finding that they conspired to manufacture, distribute, or possess with the intent to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846 (Count 3). As they did below, they advance on appeal their position that there were multiple drug-conspiracies, not one overarching one. The caselaw does not mandate that we convert a "single conspiracy . . . to multiple conspiracies simply because it can be subdivided, . . . because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (citation omitted). Rather, "whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury" by examining "the existence of a

---

[7]Drozdowski also posits that the district court erred because the jury did not apportion the drug amounts across the different counts. But he made no such argument to the district court in his Rule 29 motion. A defendant must preserve a sufficiency-of-the-evidence claim by moving for judgment of acquittal under Rule 29. *United States v. Hamm*, 952 F.3d 728, 739–40 (6th Cir. 2020). And "where a Rule 29 motion is made on specific grounds," we find forfeited all non-specified grounds. *Id*. Thus, he has forfeited this aspect of his sufficiency-of-the-evidence claim.

common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Adams*, 722 F.3d 788, 806 (6th Cir. 2013) (citation omitted).

We adopt as our own the district court's rejection of defendants' arguments when it resolved their motions for acquittal. *United States v. McKeoun*, 2018 WL 5634216, at \*9–10 (E.D. Mich. Oct. 30, 2018). In short, the evidence supporting this conviction is part and parcel to the RICO conspiracy conviction (Count 1). The government put on significant proof of the DDMC's structure, the prevalence of methamphetamine in nearly every aspect of the Club, and Smith's, Darrah's, and Witort's involvement in that scheme—Smith and Darrah ran the Club's methamphetamine network (and required their dealers to "kick up" proceeds to them) and Witort was a major supplier of the Club's methamphetamine. The government thus amply demonstrated the existence of a single conspiracy to manufacture, possess, and distribute methamphetamine. Defendants' generic arguments on appeal merit no more discussion.

3.

The DDMC clubhouses across the country, including in Alabama, Indiana, Michigan, and Ohio, had illegal gambling machines. Members and nonmembers alike could use them, and the DDMC used the proceeds to pay its expenses. And as it relates to Smith and Darrah's claim of appeal, the jury heard significant testimony linking numerous individuals to the placement and maintenance of those machines at numerous clubhouses. On these facts, the jury convicted Smith and Darrah of conspiracy to conduct an illegal gambling business in violation of 18 U.S.C. §§ 371, 1955.

RICO criminalizes participating in "an illegal gambling business," which is an illicit gambling business that "involves five or more persons" and "has been or remains in substantially continuous operation" for at least 30 days or grosses $2000 in a single day. 18 U.S.C. § 1955(a)-

(b)(1). This is a broad prohibition: "any act, duty or function which is necessary *or helpful* in operating the enterprise" is sufficient. *United States v. Merrell*, 701 F.2d 53, 55 (6th Cir. 1983). Put differently, with the "except[ion of] participation as a mere bettor," "any degree of participation in an illegal gambling business" will merit a conviction under § 1955. *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978).

Smith and Darrah challenge two aspects of the gambling-conspiracy convictions. First, they assert that "[t]here was no evidence introduced regarding the length of time any slot machines remained in continuous use for an extended period of thirty days, or that revenues from any slot machine, individually or combined, generated revenues of $2,000 in any single day." They did not raise that as a ground for dismissal below in their Rule 29 motions, rendering it forfeited. *Hamm*, 952 F.3d at 740.

Second, they dispute witness testimony regarding specific individuals' involvement and knowledge of the machines. Their argument ignores the statute's broad coverage—any act that is helpful to the enterprise suffices to establish the five- person minimum threshold. *Sanabria*, 437 U.S. at 70 n.26; *Merrell*, 701 F.2d at 55. And that is what we have here: two members were the only ones to have keys to the machines at the Blue Water clubhouse; Mastromatteo and Vernon Rich maintained the machines; and another member sold a machine to Smith when the latter said "[h]ey, that Cherry Master at the clubhouse, I could use that in Alabama." These five actions alone are enough, not to mention the actions of other members, which Smith and Darrah do not contest.

4.

Darrah challenges the sufficiency of the evidence supporting his conviction under 21 U.S.C. § 841(a)(1) for possessing methamphetamine with intent to distribute. The evidence relating to this charge arose from the controlled buy we briefly summarized above as part of our

discussion of the Title III intercept, where Darrah facilitated a transaction between the supplier, Vern Rich, and a cooperating witness, DDMC member John Pizzuti. Pizzuti testified about that purchase, which was audio recorded. Darrah gave Pizzuti methamphetamine contained in a cigarette pack in exchange for $1000. While counting out the money, Darrah was asked if the methamphetamine was "f--kin good s--t," to which Darrah replied "it looks pretty good." Darrah argues in conclusory fashion that "[t]here is absolutely no credible evidence that establishes that Paul Darrah knew what was hidden inside the box." This strains credulity. We cannot consider Pizzuti's credibility on appeal, *see Jackson*, 470 F.3d at 309, and drawing all inferences in the jury's favor, a rational trier of fact could conclude that Darrah knew he exchanged methamphetamine for cash based on Pizzuti's testimony and Darrah's own words, to wit, that the drugs "look[ed] pretty good."

5.

Smith, Darrah, and Drozdowski challenge the sufficiency of the evidence supporting their VICAR convictions, which prohibits the commission of certain violent crimes "in violation of the laws of any State or the United States" "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959. Although VICAR does not cover all violent crimes committed by those associated with an enterprise, we do not require the government "to prove the defendant acted 'solely' or 'primarily'" for an enterprise-related purpose. *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (citation omitted). Rather, it need only demonstrate "an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise." *Id.* (citation omitted). So, for example, we have held that a jury can reasonably infer this motive "where the evidence shows that a defendant committed the violent crime 'because he knew it was expected of him by reason of his membership

-51-

in the enterprise or that he committed it in furtherance of that membership,'" *United States v. Ledbetter*, 929 F.3d 338, 358 (6th Cir. 2019) (citation omitted), like retaliating violently in response to disrespectful behavior, *United States v. Odum*, 878 F.3d 508, 519 (6th Cir. 2017). Smith, Darrah, and Drozdowksi's VICAR convictions stem from three different incidents, which are set forth in turn.

a.

David Drozdowski assaulted an innocent citizen, Robert McClure, at a Detroit-area club. McClure went to the club to see a heavy-metal band play. He was wearing a vest that contained patches for another band, Black Label Society. Those patches were akin to motorcycle-club patches generally, and quite unfortunately for McClure, resembled the patch of one of DDMC's rivals, the Black Pistons. Drozdowski noticed McClure when he entered the club and called Smiley Villa, a frequent associate of the DDMC, for assistance. Villa told a witness that he left the DDMC clubhouse after receiving a call from Drozdowski that night because "his brother needed him." Drozdowski then pointed McClure out and told Villa to "watch out" because he thought McClure was a Black Piston. Toward the end of the show, Villa approached McClure, got "in his face," and repeatedly screamed at him to take off his vest. McClure's friend tried to defuse the situation by unsuccessfully explaining to Villa that the vest showed support for a band, not the rival motorcycle club. McClure started to remove the vest, but then Drozdowski—wearing a DDMC vest—approached from the side and "sucker-punched" McClure on the side of his head. The punch caused McClure to fly back several feet, hit a wall, and lose consciousness. He was ultimately diagnosed with acute head trauma, a broken jaw and broken sinus bones. Villa and Drozdowski then ripped the vest off the unconscious McClure, left, and excitedly displayed it. Drozdowski later told the FBI case agent that he believed Villa had hit McClure. On this and other

evidence, the jury convicted Drozdowski of assault in aid of racketeering activity in violation of 18 U.S.C. § 1959. Drozdowski contends this evidence was insufficient for three reasons.

First, Drozdowksi says that, by this point, there was no longer a RICO enterprise, so he could not have been associated with it and his assault could not have been in aid of racketeering. But as set forth above, there was evidence of an enterprise and Drozdowski's association with it.

Second, he paints the assault as an isolated incident driven by Villa's desire to steal a rival's vest and thus claims his sucker punch was not an attempt to maintain or increase his position in the enterprise. Viewing the facts in the light most favorable to the government, we must disagree. The jury heard that Drozdowski identified McClure and called Villa for help because of the patches on McClure's vest. It heard that before Drozdowski assaulted McClure, Villa had done the same. It heard the pair proudly displayed the vest later that night. And it heard extensive testimony about Drozdowski's interest in "climb[ing] the ladder" of the DDMC, including leading its Blue Water chapter. This is more than enough to establish that Drozdowski's unprovoked attack was done to either maintain or increase his position in the RICO enterprise. *See Ledbetter*, 929 F.3d at 358; *Odum*, 878 F.3d at 519.

Finally, Drozdowski concedes he forfeited his third argument—that the government did not establish that he assaulted McClure with the intent to cause great bodily harm—by failing to raise it in his Rule 29 motion. *See Hamm*, 952 F.3d at 740.

b.

DDMC member Scott Perkins permitted Villa (of the McClure assault) to move into Perkins' house, which he shared with his then-girlfriend, Kim Hood. Villa had been kicked out of another motorcycle club and stored a motorcycle that he had reported stolen at Perkins' house.

Darrah instructed Perkins to get the motorcycle out of his house "asap" because, according to Darrah, "you don't need his s--t over there to get you dirty."

Villa frequented DDMC bars. And at one, the Green Street Tavern (where Darrah's "old lady" worked), he "tore it up and disrespected people." The government introduced into evidence calls between Perkins and Darrah wherein Darrah says he had "a problem" with Villa's behavior. Darrah told Perkins that Villa was not to go into the bar again because "he's embarrassed, he's . . . threatened people that I . . . care for over there." And if Villa did not listen to Darrah, he would "come out there and beat the f--kin s--t out of him."

After that incident (which occurred five days after the get-the-motorcycle-out-of-the-house instruction), Smith, Darrah, and Vandiver then pulled up to Perkins's house "at a high rate of speed." They got out of the car with Smith carrying a club typically used to lock a steering wheel, and gave Perkins an ultimatum: "get that Vigilante out of [his] house" or "both [would] get hit with a . . . club." So, Perkins kicked Villa out. (The Vigilantes are another motorcycle club.) Based on this and other evidence, a jury convicted Smith and Darrah of VICAR.

Smith and Darrah contend this evidence was insufficient to establish a VICAR conviction, challenging only whether the government proved this confrontation was "for the purpose of maintaining [their] position . . . [in] a racketeering activity." To support this claim, they point to a different portion of testimony than cited above—Perkins noted that Villa's drinking and presence at the home strained his relationship with Kim Hood. And at some point, Hood contacted Darrah about her problems with having Villa at the house. So, Smith and Darrah argue, this was at most a personal feud that Darrah resolved and thus its animating purpose was not enterprise related.

Smith and Darrah are correct that one view of the facts supports their this-was-a-personal-dispute claim. But that is not how the appellate review of sufficiency-of-the-evidence claims

works. We must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Jackson*, 470 F.3d at 309 (citation omitted). And through that prism, the evidence discussed above presents a picture of an assault not because of domestic issues, but because Darrah viewed Villa as embarrassing the DDMC and its associates with his drunk and disorderly conduct. *Hackett*, 762 F.3d at 500.

c.

Danny Burby was a DDMC member. He dated Michelle Richards. Richards knew the DDMC's rules for women: "We just weren't to disrespect any of the brothers. . . . [W]e couldn't like talk rude to them or be mean to them or disrespect them." And if they did, they "would get punished or beat up." Indeed, she recounted a time where she witnessed this firsthand—she saw Smith push a member's girlfriend to the ground and then kick her out of a party for getting into a fight with the member and "getting loud and obnoxious." A similar instance happened to Richards at one of the DDMC's parties.

After Burby and Richards got into an argument, Richards went looking for her purse in the saddlebags of their motorcycle so she could leave. In the process, she threw Burby's DDMC patched vest on the ground. This caused Smith (and others, including Darrah and Vandiver) to approach. Things escalated quickly. Smith told her to go sit by a fire and Richards declined. He then yelled at her, calling her a "c--t." She responded by telling him to "f--k off," so he repeated the remark and then "smacked" her. Richards told Smith "he hit like a b---h" and again "to f--k off." So Smith punched her, grabbed her by her hair, threw her to the ground, got on top of her, and hit her with his fists and opened-hands "[p]robably at least 20 times." Smith stopped only when Burby pulled him off her. The attack left her with a black eye, lumps, bruises, blood coming

from her nose and mouth, and pain. And for this the jury convicted Smith of attempted assault in aid of racketeering activity in violation of 18 U.S.C. § 1959.

Smith presses three agreements on appeal, none of which persuade.

First, Smith contends the evidence demonstrates he assaulted Richards only after her provocation and thus did not satisfy VICAR's purpose element. But this argument ignores the record evidence establishing how the DDMC expected women to "behave" and the value it placed on the "patch" sewn on to a member's vest. With this understanding, a rational juror could conclude Richards's actions disrespected Smith (regardless of being provoked), and that it was expected of him to display his disgust with physical violence in order to maintain his role as Club president. *See Ledbetter*, 929 F.3d at 358; *Odum*, 878 F.3d at 519.

Second, he says the government failed to prove that he intended to do great bodily harm as required for a conviction under M.C.L. § 750.84. He provides no facts or argument in support. Regardless, there is more than sufficient evidence in the record to satisfy that element—Smith (a large man) sat on a petite woman and hit her until he was pulled off by Burby. Given the surrounding facts and circumstances, *People v. Beaudin*, 339 N.W.2d 461, 463-64 (Mich. 1983), a rational juror could infer such intent.

Finally, Smith selectively quotes § 1959(a) to argue the government did not prove the assault "resulted" in a serious bodily injury. But he omits the other part of VICAR—one who "attempts or conspires . . . to" "commit[] assault resulting in serious bodily injury" also violates VICAR. § 1959(a). That is what the jury convicted Smith of.

6.

Smith's assault of Richards also resulted in conspiracy-to-obstruct-justice-by-witness-tampering convictions. After the assault, several DDMC members (including Smith and Darrah)

-56-

were recorded talking about how they did not want Richards or Burby to "do anything stupid" and wanting to find out if either had talked to law enforcement. Burby says he immediately quit the Club, so Darrah instructed others to take his DDMC materials and to "tell him to shut his motherf--king mouth before he doesn't have one to shut."

This happened around the same time federal agents executed search warrants at multiple DDMC locations. So the DDMC labeled Burby a snitch, and even went as far as flyering bars and other Club gathering spots with a photograph of Burby that said "Snitches get stitches." This caught the FBI's attention, and Special Agent Fleming reached out to Burby with reason to believe DDMC members were "looking to do harm to [him.]" This fear was well-founded—the jury heard testimony indicating that Darrah asked a member several times to beat up Burby. Fleming also approached Darrah, stating that he "had received information that members of the Devils Diciples might try and harm Mr. Burby"; Darrah responded "that he would talk to the members of the Devils Diciples about the situation." A few days later, Burby was assaulted by several DDMC members at a bar. Based on this and other evidence, a jury convicted Smith and Darrah of conspiracy to witness tamper.

On appeal, Smith and Darrah focus almost exclusively on the events just before and during the assault. In their view, the assault happened because Burby sought it out—he showed up at the bar "expecting a confrontation" and even brought some friends as backup. They also focus on Burby's testimony that he was not afraid of them and at one point even threatened Darrah after hearing of the snitch posters.

But this matters not for a conviction to conspire to witness tamper. 18 U.S.C. § 1512(b)(3), makes it a crime to conspire to use intimidation or threats with the intent to "hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the

commission or possible commission of a Federal offense." §§ 1512(b)(3), (k). A jury could ably conclude that Smith, Darrah, and others tried to make sure Burby did not report Smith's assault of Richards (the federal crime) through their phone calls trying to figure out if he had talked to the police (and trying to get him not to), the snitch flyers, and the assault.

7.

In 2006, a jury in a separate case convicted Castano of drug-distribution and firearm-possession offenses. *See Castano*, 543 F.3d at 829. The FBI later learned several DDMC members lied about the circumstances supporting Castano's conviction for being a felon in possession. *See, e.g.*, *United States v. Castano*, 906 F.3d 458, 461–62 (6th Cir. 2018) (detailing the lies by four individuals). As relevant for this issue, Keith McFadden falsely testified that his girlfriend, Stella Herron, purchased the gun discovered in a truck Castano was driving (which happened to be loaded with fifty pounds of marijuana), that the gun belonged to McFadden and Herron, and that Castano did not know about the gun. *Id.* According to McFadden, he did so only after a visit from Smith and Darrah. They, like others in the DDMC, approached him after Castano's arrest and told him "it would be a good thing if [he] was to take care of a brother." McFadden testified that he "didn't have a choice," and they hatched a plan for him to "claim the gun as Stella's." So Castano, McFadden, and Herron got their stories "straight," with Smith confirming with Herron that she was going to "help" Castano out and Darrah calming Castano's fear that she was "not going to be believable." On this (and other) evidence, the jury in this case convicted Smith and Darrah of conspiracy to suborn perjury and obstruct justice.

Defendants claim that this conduct does not demonstrate a conspiracy to suborn perjury for two reasons. First, they contend the evidence shows McFadden testified for Castano in exchange for Castano's money and drugs, that McFadden alone convinced Herron to perjure herself given

she was in an abusive relationship with McFadden, and that McFadden is not credible because he lied about abusing her. Second, they assert only Smith made the "take care of a brother" comment.

Forfeiture dooms these arguments from the start. Defendants' Rule 29 motion was specifically, and only, predicated on attacking the credibility of McFadden and Herron. Having failed to raise the arguments they press here in their Rule 29 motions, these claims are forfeited. *Hamm*, 952 F.3d at 740. And even if not forfeited, the evidence set forth above—that the DDMC's president (Smith) and vice-president (Darrah) approached the two to "help" a member avoid a firearm charge and then assisted with their testimony—more than demonstrates that a rational juror could conclude Smith and Darrah conspired to suborn the perjury of McFadden and Herron.

8.

Law enforcement officials executed a search warrant on Drozdowski's trailer and discovered rifle and shotgun ammunition. The ammunition was in two different locations in the trailer—the rifle rounds were on a display case in the living room and the shotgun shells were in a closet near the bedroom. On this evidence, a jury convicted Drozdowski of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g).

The offense of being a felon in possession under 18 U.S.C. § 922(g) consists of three elements: (1) being a prior felon; (2) knowing possession of ammunition; and (3) an interstate nexus. Drozdowski contends he did not constructively possess the ammunition. Constructive possession occurs "when the defendant does not have possession but instead knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Vichitvongsa*, 819 F.3d 260, 275 (6th Cir. 2016) (citation omitted). "Proof that the person has dominion over the premises where the [prohibited item] is located is sufficient to establish constructive possession." *United States v. Kincaide*, 145 F.3d 771,

782 (6th Cir. 1998) (citation omitted). Put differently, "[a] jury is entitled to infer that a person exercises constructive possession over items found in his home." *United States v. Hill*, 142 F.3d 305, 312 (6th 1998) (citation omitted).

Drozdowski contends the government did not establish constructive possession because "[t]here is no indication in the record that Drozdowski knew either the shotgun shells or the rifle rounds were in the trailer." To make this argument, he mainly points to the testimony of his roommate, who testified that she placed the shells in the closet after unpacking a box belonging to Drozdowski's former roommate. And he argues there was no evidence about how visible the rifle rounds were.

This argument is meritless. It is undisputed that numerous rounds of ammunition were found in Drozdowski's home and that alone is enough to establish constructive possession. *See Kincaide*, 145 F.3d at 782. That the rounds may have belonged to someone else or perhaps were not in plain view does not hurdle the high bar required to set aside the jury's constructive possession finding. *Persaud*, 866 F.3d at 379–80.

C.

Defendants next challenge various jury instructions. We have already rejected one of their challenges in the published opinion issued with this appendix, concluding that the district court properly instructed the jury as to the elements of RICO conspiracy. We now address, and reject, the remaining jury instruction issues.

Where defendants preserved the issue by objecting below, we must determine "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Hendrickson*, 822 F.3d at 818 (citation omitted). We review "the legal accuracy of jury instructions de novo, . . . [b]ut a district court's refusal to give an instruction requested by the

defendant must amount to [an] abuse of discretion in order for us to vacate a judgment." *United States v. Pritchard*, 964 F.3d 513, 522 (6th Cir. 2020) (citation omitted). Further, a jury instruction that omits or misdescribes an offense's elements is subject to harmless-error review. *See Neder v. United States*, 527 U.S. 1, 9–10 (1999).

1.

Defendants first claim that the district court incorrectly instructed the jury regarding the interstate commerce nexus requirement of the RICO conspiracy charge. They requested an instruction that advised the jury that the government was obligated to prove that the Club's "non-economic activities" had "a substantial effect on [interstate] commerce." The district court instead opted for the government's proposed instruction, which required the government to prove only that the DDMC "engaged, or would engage in interstate economic activities" for which "a minimal effect" on interstate commerce suffices. The district court's instruction was correct. As set forth in *United States v. Riddle*, "a de minimis connection suffices for a RICO enterprise that 'affects' interstate commerce." 249 F.3d 529, 537 (6th Cir. 2001).

Defendants derived their proposed instruction from *Waucaush v. United States*, 380 F.3d 251, 255–56 (6th Cir. 2004). There, a defendant charged with RICO conspiracy challenged his conviction on grounds that the enterprise he took part in had not been involved in interstate commerce. *Id.* at 255. We agreed and set forth an exception to *Riddle*. *Id.* The general rule, we said, complied with the Commerce Clause of the Constitution where "the enterprise itself had engaged in economic activity," for example by operating an illegal gambling business, extorting money, and fencing stolen merchandise. *Id.* But where an enterprise engaged only in "violence *qua* violence," it was purely non-economic activity, so Congress could not criminalize it under the Commerce Clause without showing a substantial effect on interstate commerce. *Id.* at 256; *see*

*United States v. Morrison*, 529 U.S. 598, 617–18 (2000). *Waucaush* does not apply here because the DDMC enterprise was engaged in quintessentially economic activity like selling narcotics and stolen motorcycle parts. In other words, the district court correctly used the "minimal effect" language endorsed by the *Riddle* court, rather than the "substantial effect" instruction required by the non-economic activity at issue in *Waucaush*.

2.

Defendants' last RICO-centric challenge to the jury instructions is a claim that the district court abused its discretion by declining to give the jury special interrogatories requiring it to unanimously agree or disagree to the acts of racketeering charged in the indictment. This argument fails. First, the jury need not be unanimous as to specific *acts* of racketeering. *See United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014) (collecting cases). To the extent that unanimity as to the *type* of racketeering act is required, the district court gave such an instruction. Defendants thus sought the special interrogatories only to confirm that the jury followed the court's instructions. In this circumstance, the "decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge." *United States v. Applins*, 637 F.3d 59, 83 (2d Cir. 2011); *cf. United States v. Blackwell*, 459 F.3d 739, 766–67 (6th Cir. 2006) (finding no abuse of discretion in the district court's refusal to use special verdict form where the instructions accurately set forth the law). We conclude that the district court's decision not to give the special interrogatories was not an abuse of discretion.

3.

Defendants also appeal the district court's instructions on two of the alleged predicate racketeering activities defined under Michigan law (second-degree murder and assault with intent to murder) because, in their view, the court was required to instruct the jury to consider, as an

element of the offense, whether the charged acts were justified or mitigated by circumstance. The district court's instructions tracked Michigan's Model Criminal Jury Instructions, which make clear that the mitigation instruction is situational and only required when supported by the evidence. This is consistent with Michigan caselaw. *See, e.g.*, *People v. Stevens*, 858 N.W.2d 98, 104 (Mich. Ct. App. 2014) ("Once a defendant raises the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution must exclude the possibility of self-defense beyond a reasonable doubt." (internal quotation marks and citation omitted)). Accordingly, because the district court found that the defendants had introduced no evidence of justification or excuse, and because defendants do not challenge that conclusion on appeal, it could not be an abuse of discretion for it to refuse to give the mitigation instruction when defining the crimes of second-degree murder and assault with intent to commit murder.[8]

4.

Drozdowski, Castano, and Rich challenge the district court's alleged refusal to give a multiple-conspiracy instruction. While it is true the district court initially declined to give such an instruction, it ultimately decided to give one after hearing the "tenor" of the closing arguments. After so instructing the jury, the court specifically asked whether counsel were satisfied with the multiple conspiracy instruction, and counsel for all three defendants confirmed that they were. Consequently, defendants concede that this claim has been waived.

---

[8]At argument, Smith argued for the first time that the evidence produced at trial mandated the inclusion of a mitigation and/or justification instruction. But "a party does not preserve an argument by raising it for the first time at oral argument." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009).

5.

Defendants next claim the district court erred when giving supplemental instructions regarding the nature of conspiracies during jury deliberation in the first trial.

The district court instructed the jury on multiple conspiracies in its main set of instructions. But after the jurors sent out questions implicating the issue and the district court unsuccessfully referred them back to the written instructions, the court gave a supplemental instruction, stating in part: "[T]he question before you is whether a defendant has been proven, beyond a reasonable doubt, to have knowingly and intentionally engaged with another person—named or unnamed, known or unknown—in the single conspiracy charged in the indictment[.]" The next day, the jury sent out another question: "Does 'one single' conspiracy . . . mean that each defendant charged in Count 3 must be part of an interconnected conspiracy or are they charged with an individual conspiracy that is not interconnected to the other defendants charged?" After conferring with counsel, the court gave another supplemental instruction over defendants' continued objection:

> Your question refers to a conspirator or a conspiracy being "<u>interconnected</u>" to or with the other defendants. A conspiracy is, by its very nature, an <u>agreement</u>. In my instructions, I do not use the term "interconnected." It is your task, in this regard, to determine whether there is agreement between at least two people, or more, to commit the crime or crimes charged. That is the essence of a conspiracy. Now, in order for the Government to prove that a particular defendant was a member of a particular conspiracy, it is necessary to prove only that the defendant knew of the conspiracy, intentionally associate[d] himself with it, and knowingly contribute[d] his efforts in its furtherance. So, the essential question before you in this regard is whether the government has proved the existence of at least the conspiracy alleged in Count 3: a single conspiracy to manufacture, distribute, or possess with intent to distribute one or more kinds of controlled substances as specified in that Count.
>
> Finally, remember, of course, that proof that a defendant was a member of another conspiracy is not enough by itself to convict that defendant of being a member of the conspiracy in Count 3; on the other hand, bear in mind that even if a defendant has been proved to be a member of another conspiracy, that fact is not necessarily inconsistent with also being a member of the conspiracy charged in Count 3, as

long as the government has proved, by the requisite burden, that the defendant was, in fact, a member of the conspiracy charged in Count 3.

Defendants contend these instructions either constituted a constructive amendment of the indictment or eliminated the defense of multiple conspiracy in violation of their right to due process.[9] More specifically, they take issue with the court's instruction that as long as the jury found a defendant had engaged with another person "known or unknown" in the charged conspiracy, it could find him guilty; this, they say impermissibly "broadened the indictment to charge a conspiracy with any person to manufacture or traffic in methamphetamine over 500 grams from 1992 to 2012 in the Eastern District of Michigan, Alabama, Arizona, California, Indiana, and Ohio." The government asserts that there was no constructive amendment of the indictment because the district court's supplemental instructions accurately clarified basic principles of conspiracy law.

"A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Martinez*, 430 F.3d at 338 (citatiom omitted). Constructive amendments are "per se prejudicial because they infringe upon the Fifth Amendment's grand jury guarantee." *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006)

---

[9]Without a single citation to authority and with little developed argument, Smith says that the supplemental instructions were "legally incorrect" and that they prejudiced the defendants. While not entirely clear, we understand him to be arguing that the district court omitted as an element that a defendant must knowingly and intentionally join the conspiracy. But the district court adequately conveyed that by stating that "it is necessary to prove only that the defendant knew of the conspiracy, intentionally associated himself with it[,] . . . and knowingly contributed his efforts in its furtherance." Accordingly, we conclude that Smith has not presented any meritorious argument regarding the supplemental jury instructions.

(internal citations, brackets, and quotations omitted). Because of the constitutional injury that results from a constructive amendment, when proven, a defendant is entitled to a reversal of his conviction. *Id.* Where preserved, we review a claim of constructive indictment de novo. *Id.* at 961.[10]

It is black-letter law that a single conspiracy may be proved even if a defendant did not know every other member, and even if he did not participate in every aspect of the conspiracy. *See Maliszewski*, 161 F.3d at 1014–15. It does not change matters if the government fails to identify every person who joined the conspiracy or expressly decides *not* to charge some members of the conspiracy. *See, e.g.*, *United States v. Fishman*, 645 F.3d 1175, 1190 (10th Cir. 2011) ("The . . . indictment specifically stated that there were more conspirators, 'known and unknown,' and the fact that not all were charged does not necessarily mean they operated in a separate conspiracy."). "In short, the case law makes plain that evidence of multiple players and multiple locales does not equate with evidence of multiple conspiracies." *Maliszewski*, 161 F.3d at 1015. Nothing in the court's supplemental instructions allowed for the jury to find a defendant guilty on Count 3 for engaging in a conspiracy other than the one charged in the indictment. Accordingly, the district court's supplemental instructions did not constitute a constructive amendment of the indictment.

---

[10]However, "where no specific objection is raised regarding a constructive amendment" below, and the government raises the failure on appeal, we review for plain error. *See United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008). The government has not pressed for plain-error review, so despite defendants' failure to raise constructive amendment of the indictment below, we review this issue de novo. *See United States v. Williams*, 641 F.3d 758, 764 (6th Cir. 2011).

6.

Defendants also challenge two of the district court's instructions, which deviated slightly from the Sixth Circuit Pattern Jury Instructions.

First, Smith claims reversible error from the district court's reasonable doubt instruction, which omitted language from the model instruction that reads "[p]roof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives." However, we recently decided that the exact instruction given by the district court was not an abuse of discretion in an appeal from another trial conducted by the same district judge. *See United States v. Ashrafkhan*, 964 F.3d 574, 577–80 (6th Cir. 2020). That decision controls here.

Additionally, defendants challenge the district court's instruction regarding the consideration of evidence because of a minor deviation from Sixth Circuit Pattern Instruction 1.04(5). The district court instructed the jury as follows:

> Don't speculate about what some potential witness who did not testify might have said or what some potential document or exhibit that was not introduced into evidence might have shown. Such things that are not received in evidence are not evidence and you are bound by your oath to not let them influence your decision in any way. In other words, make your decision based on the evidence as I have defined it here, and not on anything else.

This instruction, they claim, "completely undermine[d] the concept of reasonable doubt[,]" because it forbade the jury from considering the lack of evidence.

But when the jury instructions are put in context and viewed as a whole, they are not confusing or misleading as is required to demonstrate an abuse of discretion. The district court accurately instructed that the "presumption of innocence stays with [a defendant] unless the Government presents evidence here in court that overcomes the presumption and convinces you

beyond a reasonable doubt that the defendant is guilty." And it later reiterated its do-not-speculate instruction while specifically directing the jury to remember that "the law does not impose upon any defendant in a criminal case the burden or duty of calling any witness or producing any evidence." In sum, the jury was properly instructed to consider only the evidence properly vetted by the court, while keeping in mind that the government bore the burden of establishing beyond a reasonable doubt the charged offenses. Accordingly, the district court's instruction regarding the consideration of evidence was not an abuse of discretion.

7.

Defendants claim the district court abused its discretion by declining to give a limiting instruction (as part of its closing jury instructions) regarding the Cadillac murder. The defendants requested that the district court tell the jury that this episode was

> offered for the limited purpose of providing background or context and is not substantive evidence against any individual defendant nor is it substantive evidence which you can consider in determining the existence of an enterprise. Nor can you use this information to determine whether the government has proven beyond a reasonable doubt those elements of Racketerring [sic] as I have defined them for you.

The district court declined, reasoning that it had given limiting instructions throughout the trial "where testimony was elicited regarding background information." It further observed that the proposed instruction was not accurate—some of the testimony *had* been admitted as substantive evidence of the conspiracy. Defendants do not address the district court's ruling that evidence of the Cadillac murder was admitted as substantive evidence of the conspiracy, rather than as background. They therefore have forfeited review, and we decline to excuse the forfeiture. *Hendrickson*, 822 F.3d at 829 n.10.

8.

Defendants next claim that the district court abused its discretion by declining to give the Sixth Circuit Pattern Jury Instruction directing the jury to consider the testimony of addict-informants "with more caution than the testimony of other witnesses." The court declined to give the instruction after referencing *United States v. Combs*, 369 F.3d 925, 939 (6th Cir. 2004), which observed that "there is less need for a special jury instruction about the credibility of an addict-informant where the jury is aware that the witness is an addict and where there was substantial corroboration for the witness's testimony." The district court concluded that it faced precisely that set of facts: "[i]t is undisputed that multiple witnesses used drugs during the time periods about which they testified. As defendants note, the record is replete with examples of witnesses admitting to their drug use." Further, the court indicated that it would give an instruction on "Testimony of Paid Informants and Witnesses Under Promise of Reduced Criminal Liability," which it believed "adequately warn[ed] the jury" to use increased caution when evaluating the testimony of addict-informants and "render[ed] superfluous" defendants' requested instruction.

On appeal, defendants rely on *United States v. Griffin*, 382 F.2d 823, 827 (6th Cir. 1967), to argue that an addict-informant instruction was mandatory under the facts of this case. There, the government's star witness was an addict, and his uncorroborated testimony was the only evidence of the defendant's personal involvement in the violation of narcotics laws at trial. *Id.* Defendant did not request an addict-informant instruction, and the district court did not give any type of cautionary instruction regarding witness credibility. *Id.* at 826. On appeal, we vacated Griffin's conviction, holding that it was plain error for the district court not to *sua sponte* give the addict-informant instruction. *Id.* at 829. We find *Griffin* easily distinguishable because the defendants have not pointed to any uncorroborated testimony by the drug-using witnesses, and

moreover, their "financial motivations" for testifying "were sufficiently addressed in another, more appropriate jury instruction." *United States v. Smith*, 624 F. App'x 385, 392 (6th Cir. 2015) (distinguishing *Griffin* on analogous facts). Accordingly, the district court did not abuse its discretion by declining to give the addict-informant instruction.

9.

Next, Smith claims it was reversible error for the district court to submit to the jury for its deliberations a "Consolidated Redacted Indictment" and a separate list of overt acts that the government believed had been supported by the evidence. Defendants argue that "[i]n effect," the list of overt acts improperly provided the jury "an evidentiary road map of the government's case." For example, the list included as overt acts the Cadillac murder, Indiana murders, and Box Canyon incident. Other alleged overt acts were non-RICO predicates that tended to show the relationships between the defendants through their shared bond as DDMC members, as well as their efforts to evade law enforcement. Defendants assert the overt acts were surplusage because the government need not prove them to establish a RICO conspiracy under § 1962(d).

Federal Rule of Criminal Procedure 7(d) provides that, "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). We review the denial of a motion brought under Rule 7 for an abuse of discretion. *Moss*, 9 F.3d at 550.

In one sense, the defendants are right. "Unlike a substantive RICO charge, a RICO conspiracy charge does not require proof that the defendant committed any predicate acts and does not even require proof that the defendant agreed to commit two predicate acts himself, or even that any overt acts have been committed." *Rios*, 830 F.3d at 424 (citation omitted). However, our caselaw establishes that the government is not limited solely to pleading the elements of the offense (with anything falling outside the elements subject to being struck as surplusage). In *Moss*, a case

involving a conspiracy to distribute marijuana, we determined that a district court did not abuse its discretion by declining to strike an allegation in the indictment that one of the defendants had attempted to bribe a witness even though it was not an overt act in furtherance of the conspiracy. 9 F.3d at 549–50. We explained that "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *Id.* at 550 (citation omitted). Here, the overt acts were legally relevant because they tended to show either an agreement to form a RICO enterprise or the actual existence of the enterprise. Accordingly, the district court did not err by including the overt acts that were supported by the evidence in the indictment.

10.

Smith makes a claim of cumulative error based upon the alleged jury instruction errors detailed above. Because we conclude that the district court's instructions were permissible in all instances, their cumulative-error arguments lack merit. *See, e.g.*, *United States v. Eaton*, 784 F.3d 298, 311 (6th Cir. 2015).

D.

We turn our attention next to defendants' various issues regarding about how the government prosecuted this case.

1.

Defendants chiefly contend the prosecutor engaged in prosecutorial misconduct during her closing argument. These purportedly out-of-bounds statements came in rebuttal. *See United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (noting the importance of analyzing disputed comments in the context of trial). The district court's description of defendants' closing arguments is helpful: "Defendants, individually and as a cooperating collective, presented a combined

argument that was sometimes merely vigorous and at other times wildly vitriolic. Throughout, it was spotted with *ad hominem* accusations and evidence-free attestations." *United States v. McKeoun*, 2018 WL 5777395, at *3 (E.D. Mich. Nov. 2, 2018). Interested readers can see for themselves such specific examples in the district court's opinion.

We apply a two-step inquiry to resolve questions of prosecutorial misconduct. "First, we determine whether prosecutorial statements allegedly constituting misconduct were improper. Next, if we find impropriety, we 'then determine whether the improprieties were flagrant such that a reversal is warranted.'" *Eaton*, 784 F.3d at 309 (citation omitted). Under this second prong of the analysis, we consider four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002) (citation omitted).

We review the challenged statements "within the context of the trial to determine whether such comments amounted to prejudicial error." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). And we also give "wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were otherwise fair." *Henry*, 545 F.3d at 377 (citation omitted). Put differently, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). We review

preserved claims of prosecutorial misconduct de novo and unpreserved claims for plain error. *Boyd*, 640 F.3d at 669.

a.

We begin first with statements that drew objections, thus meriting de novo review.

i.

During the beginning of her rebuttal, the prosecutor generically referred to defendants' closing arguments as "illusions" and "magic tricks." Vandiver and McKeoun contend these references represented an "improper[] insult[ against] various members of the Defense team." We disagree. The context of the statement makes clear it was directed towards defendants' arguments, not their attorneys. And after the prosecutor made that statement, she then went through and briefly responded to those arguments. Our review of prosecutor's rebuttal reveals no improper remarks against defense counsel.

ii.

One of the witnesses, Allen Mancini, testified about his experience as a meth cook. The prosecutor characterized that testimony in rebuttal as demonstrating Mancini cooked meth "with" Devils Diciples members. Tying Mancini to the Devils Diciples was important for purposes of establishing the conspiracy to distribute more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine. McKeoun says this statement improperly characterized Mancini's testimony. He points out that Mancini testified that when he cooked in the underground methamphetamine lab in Alabama, he did not cook with anyone else. But this "snippet" of testimony was not the only evidence presented to the jury about Mancini's connection to the Devils Diciples and their methamphetamine operation—McKeoun vouched for Mancini and offered him "cook" tips, and Arnold testified Mancini helped secure ephedrine for "all of" them to use. In

-73-

general then, it was not a material misstatement of fact to say Mancini cooked "with" the others who used that lab.

iii.

In one closing, one of the defense attorneys commented on the complexity of RICO cases:

> The racketeering acts are very specific. And it takes a lot of hard work to figure this out. It is so hard for you to figure this out, that I can promise you that the lawyers in this case can't agree on anything. They can't agree on what the words mean, what the Government says, what the defense lawyers say. We can't agree on it. And yet, we're asking you to figure it out. Good luck. Good luck. That's how complicated this case is.

That garnered a prosecutorial rebuttal:

> Is RICO conspiracy too difficult to understand, as Mr. Daly suggests? Tell that to the jury that convicted Mad Anthony for the RICO conspiracy. Tell that to Iron Mike, who pled guilty to RICO conspiracy. And tell that to the countless federal juries in the courthouse and across the nation.

The district court sustained an objection to this argument.

Defendants argue the "countless federal juries" comment represented an improper "assertion[] of personal knowledge" by the prosecutor. *See Berger v. United States*, 295 U.S. 78, 88 (1935). But the district court sustained the objection and then reasonably rejected this as a fleeting comment that responded to the critique that RICO is just too confusing to be understood by any jury:

> [T]he Government was simply refuting Sutherland's attorney's intimation that RICO was too confusing, that the jury could not possibly understand it. The Government's remark was narrow, fleeting, and not of any serious moment.

That the district court did not strike the comment is of no moment—the jury plainly heard the district court sustain that objection (and many others), and regardless, the district court properly concluded that there was no prejudice resulting from it.

b.

We next turn to those statements we review for plain error given no contemporaneous objection.

i.

McKeoun's counsel drew an analogy between friends sharing whiskey together while around the kitchen table and McKeoun's approach to distributing methamphetamine. That is, in his view, the jury should see McKeoun's distribution of methamphetamine as "sharing" it amongst friends and not a conspiracy to distribute massive quantities. The prosecutor began her rebuttal to this suggestion as follows:

> Do you remember Mr. Kraizman's argument? Let's examine it. Because only in a case of this length, magnitude, and overwhelming evidence of guilt would someone actually be forced, with a straight face, to make the last-ditch argument that you should acquit the defendant because he is a sharing man. Remember the slides, ladies and gentlemen? He's a sharing man?

> Think about it. How outrageous is it to suggest to a jury that has witnessed firsthand all of the destroyed lives that were put on full display here that [McKeoun] be acquitted because he had shared, meaning distributed, ladies and gentlemen, amounts of one of the most addictive and dangerous drugs on the planet. He is a caring man. Really?

> What he's really admitting to you is that he is feeding people's addictions, or introducing new people like young Stephen Wilson, for instance, to meth. Real nice guy. Conduct of that sort is normally condemned, not embraced, of a person's good nature. You should not be confused, ladies and gentlemen.

McKeoun claims the reference to "straight face" and "last-ditch argument" was an impermissible argument that McKeoun's attorney "knew that his client was guilty." We find no plain error here, for the context of the rebuttal makes clear it was a forceful rejection of the argumentative spin advanced by McKeoun's counsel that passing out methamphetamine to friends was just the polite thing to do. And as set forth below and in other portions of this opinion, reversal would not be

required on the grounds of this one fleeting comment given the overwhelming evidence against McKeoun.

ii.

Regarding Drozdowski's closing argument, the prosecutor focused on his attorney's characterization of the assault on Robert McClure. Of note, she suggested McClure had a cane and maybe "looked handicapped." And she focused on pictures of Drozdowski that she said were "highly relevant and certainly strong evidence of intent and guilt," commenting:

> And you know, it just drove Mr. Machasic nuts, every time we showed photos and addressed them in court, of course it does. He would love for that to go away. What am I talking about? The tattoos of the brass knuckle -- the brass knuckles, and the "talk s--t" on the fists of David Drozdowski. What could be more relevant to the charge of violent crime in aid of racketeering enterprise?

As with the "last-ditch" and "straight face" references regarding McKeoun, defendants say the "drove Mr. Machasic nuts" line represented an attack that implied Drozdowski's attorney "thought that his client was guilty." But that cannot be—there is a difference between denigrating counsel (which the statement does not) and pointing out that, as the government notes, it should drive one crazy if "you couldn't easily explain" away incriminating evidence.

Drozdowski separately raises a few points regarding this rebuttal. First, he says the reference to McClure's "cane" was not supported by the record, but it was—the jury heard testimony that McClure regularly used a cane to walk (even though there was no testimony about his use of it on the night of the assault). He also contends that comment, the related "handicapped" comment, and the reference to his "[t]alk [s]--t" tattoos were irrelevant, "needlessly

inflammatory," and inappropriately labeled him a violent felon.[11]  Even if that is true (and that is a difficult conclusion given the inferential leap one can make based on the evidence presented about Drozdowski and the DDMC's violent proclivities), there cannot be plain error here due to the lack of prejudice from such isolated remarks.

c.

Finally, even if any of the above comments could be construed as flagrant, we discern no prejudice meriting reversal here.  As set forth above, the evidence against defendants was extremely strong, the comments were fleeting, and were invited by defense counsel's closing statements.  *Young*, 470 U.S. at 11.

2.

Defendants Witort and Vandiver contend the district court erred in denying the defendants' various motions for a mistrial after the government allegedly failed to produce required discovery materials in a timely fashion.  It appears that the government produced thousands of pages of electronic documents on several different occasions, including during trial.  Defendants argue the timing and manner of the disclosures inhibited their ability to properly prepare a defense.  We review for abuse of discretion a district court's management of criminal discovery and denial of a motion for mistrial.  *United States v. Warshak*, 631 F.3d 266, 296 (6th Cir. 2010); *Martinez*, 430 F.3d at 336.

We address this issue in summary fashion.  It is hard to review for abuse of discretion when defendants do not even tell us *where* in the record the district court resolved their motions, let alone

---

[11]And as referenced in the sufficiency-of-the-evidence discussion, Drozdowski also relies on the prosecutor's misstatement that tied his possession of those guns to his ammunition charge. But as set forth in that section, that amounts at most to harmless error.

*its reasoning* for doing so.[12]  It is not the court's job to do the parties' work, and that well-worn principle applies with significant force here given nearly 2,600 documents have been filed on the district court's docket, amounting to over 43,000 pages.  *Knight Capital Partners Corp. v. Henkel AG & Co.*, 930 F.3d 775, 780 n.1 (6th Cir. 2019) (recounting the apt saying that "judges are not like pigs, hunting for truffles that might be buried in the record" (internal quotation marks and brackets omitted)).  Moreover, defendants' briefing identifies no specific wrongful disclosures and no specific prejudice resulting from those delayed disclosures, which renders their arguments forfeited.  *See Hendrickson*, 822 F.3d at 829 n.10.

3.

Witort asserts the prosecutor improperly vouched for government witnesses when she inquired about their agreement to testify.  Improper vouching "occurs when a prosecutor either (1) bluntly states a personal belief in a witness's credibility, thereby placing the prestige of the office of the United States Attorney behind that witness, or (2) implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *Henry*, 545 F.3d at 378–79 (citation omitted).  Our review tracks the review of defendants' claims for the prosecutor's alleged misconduct during closing argument—we first determine whether it was improper, and then next if improper through the prism of the four factors discussed above (tend to mislead/prejudice; isolated vs. extensive; accidental or deliberate; and strength of evidence against the accused).  *Id.* at 376.

---

[12]Indeed, Vandiver's brief reads as if it were copied and pasted from a motion filing below, with many references to "this court" even though it is clearly describing something the district court did.  It also "incorporate[s] by reference into its appellate brief [the applicable mistrial motion] filed in the district court," which is improper. *Thomas M. Cooley Law Sch.*, 459 F.3d at 710.

Testimony from Danny Burby is an exemplar. Here is the relevant direct examination passage to which Witort directs us:

Q. All right. So as part of your cooperation, did you enter into an agreement with the Government?

A. I did.

Q. And what was your understanding of what that agreement involved?

A. To come here and give the whole truth and nothing but the truth. Be honest about everything you've done in your past, and --

Q. Were you allowed to hold back?

A. Can't hold anything back.

Q. Can you protect anybody at this point?

A. No.

Q. What happens if you hold back or protect someone?

A. The plea is no good. The offer is no good.

Q. And what will happen to you?

A. Potentially be charged back with what I had.

And the prosecutor revisited this testimony on redirect:

Q. Okay. I want to talk to you about your deal. After you turned the corner and decided that you wanted to cooperate with law enforcement, you indicated that you were truthful with law enforcement at that point with one exception; is that correct?

A. Yes.

Q. And what is your understanding of how it is that you -- what it is you have to do before you're going to be getting this deal? In other words, what do you have to do here today before you're going to be able to receive the benefit of any deal with the Government?

A. To be completely honest. To tell the truth, the whole truth, and nothing but the truth.

Witort apparently contends this exchange shows improper vouching because "the prosecutor elicited testimony that Burby understood that, under the terms of his plea agreement, if he testified untruthfully, his 'deal' would be set aside and he would be fully prosecuted." In his view, this exchange shows "[t]he jury was likely to have been misled into believing that the government has a special way of telling when someone is telling the truth." He did not contemporaneously object to these exchanges, thus plain error review applies.

We condone the government's use of witnesses' plea agreements that, among other things, discuss their requirement to truthfully testify, when the use does not otherwise cross over into improper vouching. *See United States v. Trujillo*, 376 F.3d 593, 608–09 (6th Cir. 2004). The prosecutor's line of questioning here in no way implied the witnesses' ultimate "deals" depended upon if the prosecutor believed them, *see United States v. Francis*, 170 F.3d 546, 550–52 (6th Cir. 1999), and represented an accurate depiction of the plea-agreement process. There was no error here, plain or otherwise.

4.

For completeness, we note that Castano contends the government engaged in prosecutorial misconduct when it vindictively prosecuted him.[13] But as set forth above, that argument misses the mark.

E.

After verdict, defendants filed a joint motion for a new trial under Federal Rule of Criminal Procedure 33. It was a motion in form only, adopting and incorporating by reference numerous

---

[13]Castano appears to also argue the prosecutor committed misconduct by "telling the jury Castano must be convicted because he confessed to the crimes charged, disparaging defense counsel, improperly bolstering the credibility of government evidence, and falsely stating that 50

written and oral motions and objections that they had lodged with the district court throughout trial. The district court denied the motion in one paragraph, noting their incorporation by reference was improper—it "point[ed] to no specific allegation of error or [and did not] articulate any form of reasoned analysis giving context to their motion."

Vandiver argues on appeal that this was error. He acknowledges that the general caselaw prohibits incorporation by reference at the appellate stage, *see, e.g.*, *Thomas M. Cooley Law Sch.*, 459 F.3d at 710, but says those cases are inapplicable to adoptions made in the district court. We disagree for two reasons. First, it is well settled that a party forfeits skeletal arguments, *Hendrickson*, 822 F.3d at 829 n.10, and presenting a district court with only incorporated-by-reference filings did just that. And second, Vandiver did here what doomed the initial filing in district court—he did not advance any argument as to why the district court's denial of the Rule 33 motion was wrong in substance. That is, even if the district court erred at the outset in finding the motion forfeited, he does not set forth why the district court substantively erred. And because his briefing fails to do that, he has abandoned that argument on appeal. *See Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014). To the extent he offers some argumentation in reply for the first time, that is too little, too late. *Galaviz*, 645 F.3d at 362.

IV.

Finally, every defendant challenges his sentence on procedural and/or substantive reasonableness grounds.

---

pounds equated to more than 100 kilograms." But he supports this brief sentence with no factual citations, or argument, thus forfeiting it. *Hendrickson*, 822 F.3d at 829 n.10.

A.

Before we take up their individualized arguments regarding the sentences imposed by the district court, we address one matter of general applicability. Defendants Smith, Darrah, Vandiver, McKeoun, and Witort have raised an issue under *Apprendi v. New Jersey*, 530 U.S. 466, pointing out that the maximum sentence for violation of the RICO statute is "not more than 20 years" unless "the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963. Under the *Apprendi* line of cases, any fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in the indictment and proved beyond a reasonable doubt at trial. *See United States v. Cotton*, 535 U.S. 625, 627, 632 (2002).

The district court ruled that a life sentence was available on Count 1 because the government had separately alleged in Count 3 that each defendant was guilty of conspiracy to possess with intent to distribute at least 500 grams of a mixture containing methamphetamine, and the jury made a special finding to that effect, which enhanced the sentencing penalties under 21 U.S.C. § 841(b)(1)(A)(viii) and § 846. But because no drug quantity was alleged in Count 1's specification of the meth conspiracy as a predicate act, defendants assert that raising the maximum sentence for the RICO conviction violated *Apprendi*:

> Regarding trafficking in controlled substances, the indictment identified trafficking in controlled substances under Arizona and Michigan law and 21 U.S.C. §§ 841 and 846, none of which carry a maximum sentence of life. Yet the district court submitted to the jury, as the only activity that would increase the maximum penalty from 20 years to life, a conspiracy involving at least 500 grams of a substance containing methamphetamine was an activity *not charged* as a racketeering activity.

Even if defendants are correct, we deem this harmless error because the district court in each case imposed concurrent sentences on Count 1 and Count 3. So even if the sentences on

Count 1 are technical violations of *Apprendi*, "the sentences for each run concurrently with valid and equally lengthy sentences." *United States v. Upshaw*, 114 F. App'x 692, 716 (6th Cir. 2004) (recognizing that *Apprendi* violation in RICO conspiracy case was harmless error).[14] Accordingly, the alleged error cannot have any effect on these defendants' substantial rights. *Id.*

B.

We now turn to the individual arguments defendants make for review of their respective sentences. We review a defendant's sentence for reasonableness, using an abuse-of-discretion standard. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). "Reasonableness review has both substantive and procedural components." *United States v. Keller*, 498 F.3d 316, 322 (6th Cir. 2007). The procedural component requires us to ensure that the district court: "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as [arguments for a sentence outside the range]; and (3) adequately articulated its reasoning for imposing the particular sentence chosen." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). In evaluating the procedural reasonableness of a defendant's sentence, "we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009). And the substantive component requires us to consider whether a defendant's sentence "is too long" because the district court "placed too much weight on some of the § 3553(a) factors and too little on others." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). A within-Guidelines sentence is presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

---

[14]The Supreme Court subsequently vacated the judgment in *Upshaw* for further consideration of *United States v. Booker*, 543 U.S. 220 (2005). *See Rice v. United States*, 545 U.S. 1136 (2005) (Mem.). However, the proposition for which it is quoted above is well-established in our precedent. *See, e.g.*, *United States v. Burns*, 298 F.3d 523, 544–45 (6th Cir. 2002).

1.

Smith was convicted of: (1) RICO conspiracy; (2) illegal gambling conspiracy; (3) conspiracy to manufacture, distribute or possess with intent to distribute controlled substances; (4) witness tampering conspiracy; (5) attempted VICAR against Michelle Richards; (6) VICAR against Scott Perkins; and (7) conspiracy to obstruct justice. The district court calculated Smith's offense level at 57, which it then reduced to the maximum level of 43 and combined with Smith's Criminal History Category of I to produce a Guidelines range of life imprisonment. The court then imposed a life sentence. Smith now challenges the district court's handling of the relevant-conduct inquiry and the substantive reasonableness of his sentence.

a.

At the sentencing hearing, the court first referenced its prior orders addressing relevant conduct and its conclusion that methamphetamine and violence were at the core of the DDMC—"[m]ethamphetamine acquisition, use, and distribution was to the DDMC as water is to an aquarium" and "violence was used to . . . subdue those members who were contemplating cooperating with law enforcement, . . . resolve disputes between members, to maintain discipline within the DDMC . . . , to discourage defection, to confiscate property, . . . to promote the DDMC's self-advertised description as an 'outlaw motorcycle club,' and to further their industry of manufacturing and distributing methamphetamine." It then confirmed that Smith was accountable for all of the racketeering acts of the DDMC that occurred while he was the National President of the Club because

> his continued leadership in the club stands for, at a minimum, an implicit if not in some ways explicit agreement to participate in the DDMC's activities across the board.

\* \* \*

> So I'm intending to confirm my provisional finding of my August 2018 order, which says in substance, with respect to the national leaders of DDMC especially, and the enforcers of its rules and bylaws, specifically including Defendant Smith, the Court provisionally found that there was virtually no criminal activity that occurred in the club of which they are not aware or did not sanction, encourage, expect, reward, and therefore, reasonably foresee. The activities are certainly within the scope of the criminal enterprise, in furtherance of it, I'm prepared to say here with finality well within the reasonable foreseeability of somebody such as Mr. Smith.

The court then took up Smith's objections one-by-one and made several relevant conduct findings as to acts of racketeering that Smith claimed were not reasonably foreseeable to him. We review de novo whether conduct constitutes "relevant conduct" under Guidelines § 1B1.3(a)(1)(B), and review for clear error the underlying factual findings regarding whether that conduct is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity. *United States v. Tocco*, 306 F.3d 279, 284, 289 (6th Cir. 2002) (citation omitted).

On appeal, Smith broadly claims that the district court's relevant-conduct findings were not sufficiently "individualized and particularized" to explain why the racketeering acts were attributable to him as relevant conduct. He does not however explain *why* the district court's findings undergirding the relevant conduct determination were clear error, nor does he specifically challenge any of the court's determinations.

The district court took up these issues one-by-one over about fifty transcript pages, and in each instance, made the necessary findings to hold Smith accountable for the charged act of racketeering. In the sole case Smith cites to support his relevant conduct argument, the entirety of the district court's analysis was limited to a statement that "[t]he court finds, based on the evidence at trial and sentencing, that during Defendant's involvement in the conspiracy, approximately $449,000 was laundered and was reasonably foreseeable by Defendant." *United States v. Orlando*,

281 F.3d 586, 600 (6th Cir. 2002). We vacated that sentence because the court "did not make a specific determination of when Orlando entered the conspiracy, nor did it indicate 'the scope of the criminal activity [he] agreed to jointly undertake.'" *Id.* at 600-01 (quoting U.S.S.G. § 1B1.3, cmt. n.2). Here, the district court did far more to explain its reasoning, and certainly enough to enable appellate review. Accordingly, Smith has not established that the district court's sentence was procedurally unreasonable.

b.

Smith also argues that his within-Guidelines sentence was substantively unreasonable because the district court "engaged in what could be described as belittling name-calling" and ignored "his age (61), personal background, medical condition, and lack of a serious criminal record." We disagree. The district court considered Smith's positive personal characteristics briefly but concluded his "lengthy history" of presiding over the DDMC warranted a life sentence to reflect the seriousness of the offenses, the need for general deterrence, and the need to protect the public. The court also considered and rejected defendant's suggestion that the Bureau of Prisons would be unable to manage his medical conditions as justification for a lesser sentence. The district court's weighing of the § 3553(a) factors is "a matter of reasoned discretion, not math," so our review of a district court's sentencing decision is "highly deferential." *Rayyan*, 885 F.3d at 442. Thus, because the district court gave a reasoned decision for imposing a life sentence while considering and rejecting Smith's arguments for a lesser sentence, we conclude that the sentence imposed was substantively reasonable.

2.

Darrah was convicted of: (1) RICO conspiracy; (2) illegal gambling conspiracy; (3) conspiracy to manufacture, distribute or possess with intent to distribute controlled substances;

(4) distribution of methamphetamine; (5) witness tampering conspiracy; (6) VICAR against Scott Perkins; and (7) conspiracy to obstruct justice. The district court calculated Darrah's adjusted offense level at 56, dropped it to the maximum offense level of 43, and determined his Guidelines range to be life imprisonment. It then imposed a life sentence. Darrah challenges his sentence on grounds that the district court's drug-quantity finding violated *Apprendi*, as procedurally unreasonable because the district court's relevant conduct and drug-quantity findings were flawed, and as substantively unreasonable.

a.

Darrah first argues that the district court violated *Apprendi* by conducting routine drug-quantity and relevant conduct fact-finding at sentencing. He is apparently under the impression that it was the district court's fact-finding that enhanced the statutory maximum for the RICO conspiracy from 20 years' imprisonment to life. The argument is meritless. As discussed above, the jury made a special finding on Count 3 that the defendants had conspired to manufacture and distribute 500 grams or more of a mixture or substance containing methamphetamine. That is a life offense under 21 U.S.C. §§ 841(b)(1)(A)(vii) and 846. Accordingly, that special finding served to elevate the maximum sentence under Count 1 to life, *see United States v. Corrado*, 304 F.3d 593, 608–09 (6th Cir. 2002), and it had nothing to do with the district court's drug-quantity finding at sentencing.

b.

Darrah also challenges the district court's relevant-conduct and drug-quantity findings. He first contends that the district court clearly erred by holding him responsible for the Indiana murders, which occurred before he became a fully patched member of the DDMC. Second, he

asserts that the district court erred by relying on the chart the government had "cobbled together" to establish the drug quantity attributable to him.

The district court considered and rejected Darrah's relevant-conduct argument at the sentencing hearing. It found that even if Darrah did not receive his patch until shortly after the Indiana murders took place, they were reasonably foreseeable to him:

> THE COURT: He knew a lot, and that, I think is illustrated by his rapid rise to national leadership responsibilities in the early 2000s/late 1990s. Did he know enough to have him attributable to him these murders? Defendant, through counsel, suggests that these were not ordinary club business murders.
>
> I disagree. They were. It was all revolving around DDMC "property" being the motorcycle in question here, Wild Bill's motorcycle. The cross dressing motivation for running him down the road is nothing more than an odd detail of background.
>
> The principal point here is that he was, a decision was to separate him from the club, to run him down the road, to confiscate his motorcycle, and to use whatever force by whatever means may be necessary, to accomplish the criminal aim at issue.
>
> He resisted. The motorcycle was retrieved from his possession, Wild Bill's that is, and he got it back, right? He went and didn't he steal it or repossess it back into his possession?
>
> MS. MOHSIN, FOR THE GOVERNMENT: That's correct. When they ran him down the road, his motorcycle was taken. He then went ahead and repoed it, or repossessed it himself, leading to—
>
> THE COURT: From the clubhouse or from somebody's private—
>
> MS. MOHSIN: Letherman's apartment I believe or premises. The motorcycle had been given to Letherman to use.
>
> THE COURT: As, as exemplifying its DDMC property status, according to DDMC rules and regulations?
>
> MS. MOHSIN: That's correct, Judge. It was a practice to provide motorcycles and require the new prospects to pay the leadership for, you know, like kind of front them the motorcycle they had to pay back what was owed on the motorcycle to the club.

> THE COURT: The degree of knowledge exemplified in these things is typical of other testimony indicating the degree of knowledge and the intensity of knowledge that prospects were expected to know, at least by the time that they were eligible for full patched status.
>
> Again, this is not Venus emerging fully formed. This is a process, and it's a process that included more and more detail revelations, more and more assistance in criminal activities, more and more responsibility. And accordingly, more and more attributions of responsibility for specific acts.
>
> A preponderance of the evidence demonstrates that the defendant should be held responsible for the Bausch and Thacker murders in the course of, and in the furtherance of, and was reasonably foreseeable to an individual at Defendant Darrah's level of participation in the club at the time that these things were going on in Indiana, though, without direct participation of course, without his personal pre-knowledge, of course, but they were nonetheless reasonably foreseeable to a person in his position with his degree of knowledge. A preponderance of the evidence so demonstrates.

We cannot conclude that the district court's factual finding that the Indiana murders were foreseeable to Darrah was clearly erroneous. The district court heard considerable evidence regarding the DDMC rules and prospecting process, and based on its understanding of the DDMC enterprise, it determined that acts of violence—including murder—were foreseeable even to members who had not received their full patch when the Club had to repossess one of "its" motorcycles by force.

Darrah also claims that the district court's drug-quantity finding attributing to him fifteen kilograms of methamphetamine rendered his sentence procedurally unreasonable. The district court largely relied on the Government's Exhibit 1 to establish the drugs for which Darrah would be held responsible. This chart, which was adapted from the government's "sentencing treatise," pinned to Darrah low-end estimates of 23,055 grams of meth-mixtures, 19,129 grams of ephedrine/pseudoephedrine, and 5,305 grams of "pure meth." In converted drug weight that equated to 344,222 kilograms of marijuana, well beyond the 90,0000 kilograms needed to establish

Darrah's base offense level of 38. The district court endorsed the chart as "extremely well supported by the evidence." The court was entitled to rely on the government's presentation and the exhibit it proffered, which it found to be supported by the evidence. And upon review, the chart sets forth specific examples of both Darrah's personal involvement in the DDMC's meth enterprise, as well as examples which would be foreseeable to him. Accordingly, we conclude that the district court did not render a procedurally unreasonable sentence by attributing clearly erroneous drug quantities to Darrah.[15]

c.

Darrah lastly challenges the substantive reasonableness of his life sentence. He argues essentially that his medical conditions warranted a lesser sentence by downward departure from the Guidelines range, and that the district court did not give due consideration to that factor in its discussion of the § 3553(a) factors.

Our review of the sentencing transcript confirms that the district court acknowledged that Darrah's "health concerns" were "significant." Yet it dismissed that rationale as a justification for a lesser sentence because it did not "believe that the Bureau of Prisons [was] incapable of providing appropriate medical treatment." And it further observed that Darrah's physical condition had not inhibited him from being an "enthusiastic and gleeful participant" in the RICO enterprise, serving as a "loyal lieutenant and a constant advisor" to Smith. The district court also found that Darrah

---

[15]Darrah also makes a fleeting argument that he was improperly scored as a leader/organizer for conduct that occurred before he became the National Vice-President of the DDMC. Even if he is correct, Darrah's adjusted offense level was far beyond the maximum adjusted offense level of 43. So regardless of the leadership enhancement Darrah received, his total offense level would not change, his Guidelines range remained life, and application of the enhancement could not have affected his substantial rights. *See United States v. Cruz*, 976 F.3d 656, 664 (6th Cir. 2020).

lacked remorse, based on his statement that "reveal[ed] no comprehension of the harm that he's assisted in doing to the community, no comprehension of the seriousness of the offenses with which he's been accused and proven guilty, and no concern for anyone residing in the law abiding quadrant of society, now or in the future." The court also opined that the "most salient factor" in guiding its sentencing was "the seriousness of [the] offense conduct," while also expressing a need for general deterrence.

In short, the district court considered the § 3553(a) factors it found most relevant, explained its disagreement with defendant's argument for a lesser sentence based on his medical conditions, and imposed a presumptively reasonable Guidelines sentence of life imprisonment. The deference we owe to district courts to fashion an appropriate sentence counsels in favor of affirming Darrah's sentence. *Rayyan*, 885 F.3d at 442.

3.

McKeoun was convicted of: (1) RICO conspiracy; and (2) conspiracy to manufacture, distribute or possess with intent to distribute controlled substances. The district court calculated McKeoun's offense level at 50 by holding him accountable for all of the racketeering activity that occurred while he was a patched member of the DDMC, and then reduced to 43 because it represented one of "those rare instances where the total offense level is calculated in excess of 43 . . . [and thus was] treated as a level 43." It then varied downward and imposed a 372-month sentence. McKeoun challenges the district court's relevant-conduct finding, a factual finding rejecting his assertion that he cooked methamphetamine only for "personal use," and the substantive reasonableness of his sentence.

a.

Like Darrah, McKeoun contends the district court erroneously calculated his Guidelines range by including the Indiana murders as foreseeable relevant conduct.[16]  As an example for why the murders were foreseeable to McKeoun, the district court noted "DDMC members who left the club in bad standing were frequently required to surrender their motorcycles to the club, or have their property taken by force and violence."  McKeoun was also "present" when Vandiver and two other members stole a former member's motorcycle.  McKeoun is correct that he and another tried to stop the theft, but we discern no clear error in the district court's finding that his "com[ing] to the aid of an individual who was being threatened and assaulted per standard operating procedure of the Devils Diciples entity does not translate into a lack of awareness on his part that such things would regularly happen to Devils Diciples members who ran afoul of the system."  *See Tocco*, 306 F.3d at 284.

b.

McKeoun objected below to the PSR's description of why the racketeering activity was reasonably foreseeable to him.  Part of his objections went to his claim that he only cooked methamphetamine in small amounts for his own personal use.  The district court disagreed:

> The testimony at trial well supported the foreseeability of criminal activity generally, and repossession of motorcycles in particular, as well as the production of methamphetamine, which is the principal focus I think of this controverted item. Being a member of leadership, producing methamphetamine, and so forth, it's an unsustainable assertion that he was a personal-use cook only.  There is overwhelming evidence of his, the centrality of this figure in terms of producing for numerous others and for other chapters.

---

[16]He also implies that because he was not a formal national "leader," the district court improperly characterized him as such.  But for decades, McKeoun played a significant role in the organization, even without an official title.

I recall also testimony that he always had at least an 8th of an ounce, an "8 ball" I think that's called.

\* \* \*

It's not a personal use quantity. That's a distribution quantity. And he shared with brothers, always was ready to give them, "a little bump," if they needed it. I interpret that as being a hit of illegal drugs, methamphetamine. This objection is unfounded and is rejected.

McKeoun contends the district court clearly erred here for two reasons. First, he argues that the trial testimony did not support the conclusion that he "always had at least . . . an 8 ball." And even if it did, he argues an 8-ball (an eighth of an ounce) is just a personal-use amount, not a distribution level amount. The government does not respond to this point, but that does not mandate reversal as McKeoun insists. *See Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 n.2 (6th Cir. 2011). And reversal is not required here.

The government put forth such facts demonstrating this point in its sentencing memorandum and McKeoun did not counter these facts:

> David Roberts . . . advised that while living in Alabama, he became aware of the fact that Defendant and Little Dog were manufacturing meth and distributing it to DDMC members in Michigan. Defendant always had at least 1/8 ounce of meth on him at all times and frequently gave D. Roberts and others a "bump" whenever requested.

> Whenever Defendant came to DDMC functions in Michigan from California, there was an influx of meth, and Defendant came to Michigan a couple times a year. When D. Roberts lived with Defendant at Jeff Arnold's property in Alabama, Defendant frequently complained about the need to obtain Red Phosphorus and would disappear for 8-10 hours a day and return with freshly made, "wet" meth.

> During this time, Defendant always carried approximately 1/4ounce of meth on his person. D. Roberts learned that Defendant was cooking at the underground meth lab on the property with Al [Mancini] and Jeff Arnold. Al brought D. Roberts into the lab to assist him with the manufacturing process once when Defendant and Arnold were unavailable.

Moreover, McKeoun advances no argument as to how this alleged error influenced the ultimate sentence. Given the abundance of evidence supporting McKeoun's role in facilitating the drug trade on behalf of the DDMC, any error here would be harmless. *See Cruz*, 976 F.3d at 664.

c.

McKeoun's substantive-reasonableness challenge is equally meritless. When a defendant attacks a below-Guidelines sentence as substantively unreasonable (as McKeoun does here), the sentence is presumed reasonable and a "defendant's task of persuading us that the more lenient sentence [that he received] is unreasonably long is even more demanding." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008). He appears to claim the district court improperly weighed the 3553(a) factors and that the sentence was disproportionate, but other than listing facts in his favor (namely his service in the military, family support post-conviction, and expressions of remorse), McKeoun offers no argument as to why the district court misbalanced the factors. And upon review of the sentencing transcript (which reflects that the district court balanced the enormity of his offense conduct, his individual characteristics, and the interest of the public), nothing in the record demonstrates the district court gave "an unreasonable amount of weight to any pertinent factor." *United States v. Massey*, 663 F.3d 852, 857 (6th Cir. 2011) (citation omitted).

4.

Witort was convicted of: (1) RICO conspiracy; and (2) conspiracy to manufacture, distribute or possess with intent to distribute controlled substances. The district court calculated his offense level at 48 by holding him accountable for all of the racketeering activity that occurred while he was a patched member of the DDMC, which it then reduced to 43. It then imposed a life sentence. Witort now challenges the district court's relevant-conduct finding as it relates to its drug-quantity calculation and the substantive reasonableness of his sentence.

a.

Like several others, Witort contends the district court erroneously attributed to him a drug-quantity finding that elevated his base offense level to 38. He complains that the district court "did not engage in an individualized analysis" when evaluating Witort's relevant conduct. The record belies this assertion.

The district court largely relied on Government Exhibit 1 to establish the drugs for which Witort would be held responsible, which attributed to Witort low-end estimates of 23,615 grams of meth-mixtures, and 5,305 grams of "pure meth." In converted drug weight that equated to 354,342 kilograms of marijuana, well beyond the 90,0000 kilograms needed to establish Witort's base offense level of 38. The district court also found unpersuasive Witort's position that there were multiple drug-conspiracies and not one, concluding Witort "was involved with very large quantities of precursors, and accordingly, massive quantities of produced drugs, he didn't produce them himself, but he shepherded the production . . . . I'm very well persuaded that the drug amounts are easily well borne out here." And what was said about Darrah's identical challenge above can be repeated here. The court was entitled to rely on the government's presentation and its exhibit, which set forth many specific examples of both Witort's personal involvement in the DDMC's meth enterprise, as well as examples which were foreseeable to him. It therefore did not render a procedurally unreasonable sentence by attributing drug quantities to Witort that led to his base offense level of 38.

b.

Witort argues his life sentence is substantively unreasonable because he "is [a] 68-year old elderly man who lived in California for a good portion of his life, has substantial ties to his family, and has no significant involvement with the DDMC since the early 2000's." But a review of the

district court's sentencing transcript reflects careful consideration of the two sides of Witort, with an emphasis on the extreme severity of his crimes and the need for deterrence. It also explained its disagreement with defendant's argument for a lesser sentence based on his medical conditions and imposed a presumptively reasonable within-Guidelines sentence of life imprisonment. The deference we owe to district courts to fashion an appropriate sentence counsels in favor of affirming Witort's sentence here. *Rayyan*, 885 F.3d at 442.

5.

Although Vandiver lists as an issue the procedural and substantive reasonableness of his sentence, he does not make a substantive argument regarding either and instead just adopts the arguments of McKeoun and Rich. Federal Rule of Appellate Procedure 28(i) permits the adoption of other parties' arguments, but a party seeking to preserve an issue through adoption must ensure "that the arguments adopted must be readily transferable from the proponent's case to the adopter's case." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996). And we cannot think of an argument less susceptible to ready transfer than one concerning a defendant's sentence. At its core, a district court's decision to impose a sentence requires "an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Perez-Rodriguez*, 960 F.3d 748, 756 (6th Cir. 2020) ("[S]entences must be fashioned on an individual basis[.]"). Put differently, reviewing a district court's sentence "is an individual, fact-specific exercise that requires individual, fact-specific briefing." *United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 2002). Having only adopted McKeoun's and Rich's briefing without tailoring their arguments to his individual circumstances, we find forfeited Vandiver's sentencing challenge. *Id.*

6.

Drozdowski was convicted of: (1) RICO conspiracy; (2) conspiracy to manufacture, distribute or possess with intent to distribute controlled substances; (3) manufacturing methamphetamine; (4) VICAR against Robert McClure; and (5) being a felon in possession of ammunition. The district court calculated his base offense level at 34 based on its drug-quantity finding attributing to him between 500 and 1.5 kilograms of "actual" methamphetamine. The court then applied a series of enhancements to produce an adjusted offense level of 48, which combined with Drozdowski's Criminal History Category of V to produce a Guidelines range of life imprisonment. The district court imposed a below-Guidelines sentence of 456 months' imprisonment—420 months on the RICO and meth convictions and a consecutive 36-month sentence for VICAR.

a.

Drozdowski's first procedural argument is that the district court's drug-quantity finding attributing to him 1.5 kilograms of methamphetamine was clearly erroneous. But as the government points out, the jury found beyond a reasonable doubt that Drozdowski was responsible for at least 50 grams (or 500 grams of a mixture) of methamphetamine. If the district court had used that quantity and attributed no additional methamphetamine to Drozdowski, his base offense level would have been 30, and the sentencing enhancements—which Drozdowski does not challenge on appeal—would raise his offense level to 44. An offense level of 44 would have produced the same Guidelines range of life imprisonment. So even if Drozdowski's lengthy critique of the district court's drug-quantity calculation has merit, the error is harmless because it ultimately could not affect the sentence. *See Cruz*, 976 F.3d at 663.

b.

Drozdowski also claims that the district court made clearly erroneous factual findings regarding his assault of McClure.

At the close of the sentencing hearing, the district court imposed a consecutive 36-month sentence upon Drozdowski for his assault of McClure, on top of the 420-month sentence imposed on RICO and drug offenses. It remarked that McClure "walked only with [the] aid of a cane" and Drozdowski had "put the man down, . . . knocked him out, fractured his jaw, fractured his skull, [and] rendered him unconscious." The district court professed that it could not "express adequately how shocking and horrifying that act was. It deserves harsh punishment, and I have attempted to impose it here." Evidence adduced at Drozdowski's trial establishes that McClure's skull was not fractured—though he did suffer a fractured jaw and cheekbone. Thus, the district court's factual findings relating to the assault of McClure were at least partially in error.

Nevertheless, we conclude that the district court's error does not require remand because the record as a whole establishes "that the error did not affect the district court's selection of the sentence imposed." *See United States v. Williams*, 503 U.S. 193, 203 (1992). It is apparent from our review of the sentencing transcript that the district court would have imposed the same 36-month consecutive sentence whether Drozdowski managed to fracture McClure's skull or only inflicted the other severe injuries. In other words, even if we set that erroneous fact aside, the tenor of Drozdowksi's vicious "sucker punch" remains the same, and it still left McClure unconscious, on the floor, with a broken jaw. Accordingly, the district court's erroneous factual finding as to the specific nature of McClure's injuries did not affect Drozdowski's substantial rights and we thus disregard it as harmless error. *See id*.

Drozdowski also argues that his below-Guidelines sentence was substantively unreasonable because the district court did not place much stock in a chart he provided that purported to show lesser sentences that similar offenders involved in motorcycle gangs had received. He says that it was unreasonable for the district court to view him as "fairly unique" because all he did was make "some quantity of methamphetamine" and "punch[] some people." We find his argument markedly unpersuasive.

Drozdowski, like McKeoun, faces a decidedly uphill battle by challenging the substantive reasonableness of his below-Guidelines sentence. *See Curry*, 536 F.3d at 573. We first conclude that the district court expressed legitimate reasons for declining to rely on the chart of similar offenders that Drozdowski produced; the court knew nothing about the other individuals other than that they were involved in "motorcycle gang kind of activities" and had no information regarding their criminal history or individual sentencing characteristics. Accordingly, when the court weighed the § 3553(a) factors, it did not abuse its discretion by giving little weight to avoiding sentencing disparities among allegedly similar defendants and focusing instead on Drozdowski's criminal history, the nature and seriousness of the offense conduct, and the need for general and specific deterrence—particularly in light of the below-Guidelines sentence it imposed. We thus affirm the sentence imposed by the district court.

7.

Michael Rich was convicted of: (1) RICO conspiracy; (2) conspiracy to obstruct justice; (3) subornation of perjury; and (4) obstruction of justice. Based on an offense level of 43 (adjusted downward from 48), the district court calculated Rich's Guidelines range as life imprisonment. The district court however granted a downward variance and sentenced Rich to 360 months' imprisonment.

a.

Rich first challenges the district court's determination that the Box Canyon incident was relevant conduct. But even if he prevails, he has not challenged any aspect of the district court's Guidelines calculation based on the DDMC's meth trafficking. The PSR establishes that based on drug weight alone, Rich's offense level would have been 43. Therefore, even if he is correct that the Box Canyon incident should not have been attributed to him as relevant conduct, it would not have changed his Guidelines range. Thus, any error in attributing the Box Canyon incident to Rich as relevant conduct was harmless, and we need not delve further into the district court's relevant-conduct inquiry. *See Cruz*, 976 F.3d at 663–64.

b.

Rich also claims that he was punished for exercising his right to a jury trial, based on a line of questioning the district court engaged in during the sentencing hearing. This claim is subject to plain-error review because Rich did not object below. *Vonner*, 516 F.3d at 385. We have reviewed the transcript of Rich's sentencing and seeing nothing to suggest that Rich was punished for exercising his right to trial-by-jury. While it is true that the court inquired as to plea negotiations, that is not impermissible per se. *See United States v. Daneshvar*, 925 F.3d 766, 788–90 (6th Cir. 2019). Thus, we see no error, let alone plain error, in the district court's inquiry.

c.

Finally, Rich claims that his below-Guidelines sentence is substantively unreasonable because the district court did not give enough weight to his military service, disability, and health problems and instead used a "one size fits all" approach to sentencing. By attacking the substantive reasonableness of his below-Guidelines sentence, Rich must persuade us "that the more lenient sentence [that he received] is unreasonably long." *Curry*, 536 F.3d at 573. But the district court

gave a reasoned decision that expressly accounted for mitigating factors like Rich's military service and medical conditions. It nevertheless concluded that a sentence of 360 months' imprisonment was sufficient, but not greater than necessary based on recognition of the seriousness of the offense, general deterrence, and the need to protect the public from further crimes of the defendant. That is the essence of a substantively reasonable sentence. *See Rayyan*, 885 F.3d at 442.

8.

Victor Castano was convicted of: (1) RICO conspiracy; (2) conspiracy to manufacture, distribute or possess with intent to distribute controlled substances; (3) conspiracy to obstruct justice; (4) subornation of perjury; (5) obstruction of justice; and (6) conspiracy to possess with intent to distribute marijuana. At sentencing, the district court calculated Castano's offense level as 41 after applying several offense-characteristic enhancements, which combined with Castano's Criminal History Category of II to produce a Guidelines range of 360 months' imprisonment to life. The district court granted Castano's request for a downward variance and imposed a sentence of 336 months' imprisonment. On appeal, Castano challenges the procedural and substantive reasonableness of his sentence on many grounds, including the application of three sentence enhancements for specific offense characteristics. In our published opinion, we held that the district court properly applied an enhancement for maintaining a drug premises to Castano under U.S.S.G. § 2D1.1(b)(12). We now consider his arguments concerning the remaining sentencing enhancements, as well as the overall procedural and substantive reasonableness of his sentence.

a.

First, Castano maintains that the district court erroneously held him accountable for 1,129 grams of pseudoephedrine, which had a marijuana equivalency of 11,290 kilograms and resulted

in a base offense level of 34 for the grouped narcotics convictions. The district court's calculation was based on a spreadsheet that was admitted into evidence during trial. That chart identified numerous persons associated with the DDMC enterprise that had purchased pseudoephedrine in retail stores to be used in methamphetamine cooks (as well as the amounts they had purchased).

Castano argues that he should not be held accountable for the pseudoephedrine because he was acquitted by the jury of possessing methamphetamine precursors and/or because the full scope of the pseudoephedrine-buying ring was not reasonably foreseeable to him. That Castano was acquitted of possessing methamphetamine precursors is not dispositive of the issue because acquitted conduct may be used in sentencing so long as the district court finds the relevant facts by a preponderance of the evidence. *United States v. White*, 551 F.3d 381, 383 (6th Cir. 2008) (en banc). Moreover, Castano's personal possession of pseudoephedrine is irrelevant to the drug-quantity finding if the purchases made by others were within the scope of the conspiracy and reasonably foreseeable to Castano. *See* U.S.S.G. § 1B1.3(a)(1)(B). And they certainly were. The district court found that Castano was responsible under relevant conduct principles for all DDMC-related meth activities that occurred while he was a full member—from 2003 through 2012. In that time, Castano was heavily involved in the meth trade; he was part of the group actively manufacturing and distributing it. As the government observes, Castano, his girlfriend, and several of his associates made pseudoephedrine purchases for the purpose of manufacturing meth. Accordingly, even if Castano did not know every person who purchased pseudoephedrine for the Club's meth cooks, it was reasonably foreseeable to him that other members of the organization were acquiring it either in exchange for the finished product or for money. Accordingly, the district court's factual finding that Castano was responsible for 1,129 grams of pseudoephedrine was not

clearly erroneous, and on that basis alone, Castano's drug equivalency was greater than 10,000 kilograms of marijuana, which resulted in a base offense level of 34.

b.

After determining Castano's base offense level, the court applied the previously discussed enhancement for maintaining a drug-involved premises and two additional enhancements for possession of a dangerous weapon under U.S.S.G. § 2D1,1(b)(1) and endangering others under U.S.S.G. § 2D1.1(b)(14)(C)(ii). Based on these three enhancements, the court calculated Castano's total offense level at 41. We now take up Castano's challenges to the remaining two enhancements.

The court found that a three-level enhancement for endangering others applied because it found that it was reasonably foreseeable to Castano that Drozdowski would carelessly dispose of chemical byproducts from his meth cook by dumping them in the trailer park where he produced the meth, resulting in a substantial risk that the environment would be harmed. Castano now claims that the district court erred by not applying the four-prong test from *United States v. Davidson*, 409 F.3d 304, 313 (6th Cir. 2005), and by not making particularized findings to establish that Drozdowski's conduct was reasonably foreseeable to him. But Castano waived the former argument by stating "I believe the Court has addressed the factors under the *Davidson* case." Furthermore, the district court's factual finding of reasonable foreseeability was adequately supported, such that it was not clearly erroneous. The court stated, "[I]t's a reasonable foreseeability analysis. Mr. Castano is wise enough and experienced enough to know that his association with Devils Diciples is going to implicitly convey the knowledge to him of these things that are being done and the creation of methamphetamine, its possession, its use, its distribution and so forth." Accordingly, we affirm the application of this enhancement to Castano.

We likewise affirm the application of the enhancement for possession of a dangerous weapon. Castano claims that the enhancement was improper because "the Sixth Circuit rejects guilt by association and rejects 'the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions.'" However, we conclude that the district court's finding that "firearms were part and parcel of the DDMC operating regime" was not clearly erroneous. There was ample testimony discussing the use and possession of firearms by DDMC members at trial, and the district court specifically recalled at Castano's sentencing testimony that there were "circumstances in which members were required to arm themselves out of the back of the traveling armory . . . when going to various events." Accordingly, this is not a case—as Castano would have us believe—where the mere fact that the defendant was "involved in the drug trade" was used to establish that the presence of a firearm was reasonably foreseeable to him. *See United States v. Woods*, 604 F.3d 286, 291–92 (6th Cir. 2010).

For these reasons, we conclude that Castano's sentence was procedurally reasonable. The district court properly calculated Castano's base offense level by determining the drug-quantity for which he should be held responsible, and it correctly applied the sentencing enhancements at issue here to reach Castano's adjusted offense level.

c.

Castano makes no developed argument regarding the substantive reasonableness of his below-Guidelines sentence, which, again, is presumed reasonable. *Vonner*, 516 F.3d at 389–90. In any event, the district court outlined the § 3553(a) factors at the sentencing hearing and

explained its decision. We see no basis to vacate Castano's sentence as substantively unreasonable.

V.

For these reasons and those set forth in the published opinion, we affirm defendants' convictions and sentences.